415 F.2d 1077
 Alfredo ESTEBAN and Steve Craig Roberds, Appellants,
v.
CENTRAL MISSOURI STATE COLLEGE, Warren C. Lovinger; W.
Lester Simpson; JoeHerndon; Leland J. Culp;
Virginia Cottlieb; Byron Constance and
J. N.Cunningham, Appellees.
 No. 19565.
 United States Court of Appeals Eighth Circuit.
 Aug. 28, 1969, Rehearing Denied Oct. 3, 1969.
 
 Irving Achtenberg, Kansas City, Mo., for appellants.
 Robert L. Wesner, Sedalia, Mo., for appellees.
 Brief of Amicus Curiae (The Curators of the University of Missouri) was filed by Jackson A. Wright, T. Richard Mager and Marvin E. Wright, Columbia, Mo.
 Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 Alfredo Esteban and Steve Craig Roberds, students at Central Missouri State College, a tax-supported institution at Warrensburg, Missouri, were suspended on March 31, 1967, for two semesters but with the right thereafter to apply for readmission. The two, by their next friends, instituted the present action for declaratory and injunctive relief. The named defendants are the College, its President, and its Board of Regents. The plaintiffs allege, primarily, first, fifth, and fourteenth amendment violations. Judge Hunter, with a detailed memorandum, denied them relief and dismissed their complaint. Esteban v. Central Missouri State College, 290 F.Supp. 622 (W.D.Mo.1968). The plaintiffs appeal.
 
 
 2
 Jurisdiction is asserted under 28 U.S.C. 1331 and 1343 and 42 U.S.C. 1981 and 1983. We are satisfied as to federal jurisdiction under 28 U.S.C. 1343(3) and 42 U.S.C. 1983.
 
 
 3
 We note initially that, although the two semester suspension period has long since expired, neither plaintiff, up to the time of the oral argument on May 16, 1969, has taken the trouble to apply for readmission.[1]
 
 
 4
 The disciplinary action against the plaintiffs arose out of events which took place on or adjacent to the college campus on the nights of March 29 and 30, 1967. At that time Esteban was on scholastic probation and Roberds was on disciplinary probation. Esteban also had been on disciplinary probation over a knifing incident with a fellow student, but his disciplinary probation had expired a short time before.
 
 
 5
 Both sides in their appellate briefs specifically adopt findings of fact made by Judge Hunter with respect to these March 1967 events. Accordingly, we set forth certain of those findings here:
 
 
 6
 '* * * These demonstrations took place at the intersection of the public street adjacent to the school campus and State Highway 13 and overflowed onto the sidewalks and campus. On the evening of March 29, some 350 students were present in the mass and on March 30, there were some 600 students included. As a partial result of these two mass demonstrations there was in excess of $600 damages and destruction of college property, including broken school building windows and destroyed shrubbery; eggs were thrown; the Dean of Men, Dr. Chalquist, was hanged in effigy, his 'dummy' torn up and set on fire; traffic was halted and blocked, cars were rocked, and their occupants ordered out into the street. The college president directed a number of his personnel, including Dr. Meverden, to go to the scene to restore order.
 
 
 7
 'ESTEBAN EVENT:
 
 
 8
 '* * * The evening of March 29,[2] 1967, around 11:30 p.m., he left his dormitory about the time the 'disturbance' had subsided. Some of the students were proceeding along the street from the mass demonstration to their dormitories. Esteban proceeded down the sidewalk to within about 100 feet of the intersection of the scene of the mass demonstration and stayed there awhile. Dr. Meverden, a faculty member, who was seeking to disperse students standing outside their dorms, approached Esteban and asked him to go inside the dormitory. Instead of complying, Esteban asked why, and on again being requested to go in, again asked why. He told Dr. Meverden that he was not in violation of any state, county, or federal law and that he had a right to be out there. Dr. Meverden asked for his student identification card which by college regulation he was required to have in his possession at all times. Esteban said ('in rough words' according to one witness) he did not have it. Nor did he give his name. Dr. Meverden again requested him to go in the dormitory and get off the street. Esteban argued with Dr. Meverden and questioned his authority, saying there were no rules limiting the time men could stay outside the dorms. Shortly, and with the encouragement of other students present, he went into the dormitory. Dr. Meverden also went in and asked Gerald Haddock, the resident assistant of Esteban's dormitory, who Esteban was. Haddock was overheard by Esteban telling Dr. Meverden Esteban's name. Esteban, as Dr. Meverden was leaving, called Haddock a prick and a bastard and told him he 'would not be around very long.' According to Esteban's roommate, Esteban then angrily picked up a waste can and emptied the contents on the floor at the feet of Haddock.
 
 
 9
 'ROBERDS EVENT:
 
 
 10
 'Throughout both evenings of the mass demonstrations Roberds was present as a part of the crowd. On March 29, 1967, he arrived at the scene of the demonstration about 10:15 p.m. and returned to his dormitory about 10:45 p.m. On March 30, 1967, he arrived at the scene about 9:30 p.m. and remained until about 10:30 p.m. During the first night, while a part of the gathered crowd, he talked to students who were present in it. Roberds testified that the second evening, also while a part of the crowd at the demonstration, that 'I discussed some of the things that were going on, the rocking of the cars and the dummy. At that time I mentioned my disgust with the college, and we talked, as the people I had talked to had the same feeling.' He saw the dummy brought to the scene of the demonstration; saw it hung, torn up and burned by students in the crowd. He saw the cars approached by the students, saw the cars rocked, saw the attempts to take the occupants out of the cars. He returned to his dormitory after the dispersal of the gathering. He stated he was at the demonstrations each evening simply as a 'spectator', not participating in any of the acts of violence or destruction.'
 
 
 11
 Both sides also adopt Judge Hunter's findings as to Roberds' situation prior to the March events:
 
 
 12
 'Prior to the mass demonstrations, Roberds had been placed on disciplinary probation and furnished a written statement of the terms of that probation. Dean Chalquist also orally explained those terms to him. He and Dean Chalquist conversed relative to his intention to participate in a demonstration. Roberds asked about the possible repercussions of his involvement in (future) demonstrations or disturbances. He was advised 'that any action on your part which may reflect unfavorably upon either you or the institution can be considered grounds for suspension.' Roberds, under date of February 5, 1967, wrote E. J. Cantrell, a Representative from his county in the Missouri Legislature, the following letter:
 
 
 13
 '* * * I assure you, I do not stand alone in my disgust with this institution. From suppression of speech and expression to ridiculous, trivial regulations this college has done more to discourage democratic belief than any of the world's tyrants. * * * My comrades and I plan on turning this school into a Berkeley if something isn't done."
 
 
 14
 The procedural history of the case. These plaintiffs, after their suspensions, had filed earlier complaints (277 F.Supp. 649) in the Western District of Missouri against the same defendants. Those suits also had come before Judge Hunter. The court concluded that procedural due process had not been afforded the students and that 'the critical defect in the hearing procedure used by the college was the fact that the person to whom the students were permitted to make their explanation or showing, Dr. Chalquist, was only one of a number of persons on the board which made the recommendation of suspension.' Accordingly, the court directed the defendants to grant each of the plaintiffs a new hearing on such charges as the defendants desired to press. The court prescribed the procedure to be followed. This included a written statement of the charge to be furnished the student on at least 10 days' notice; a hearing before the college's president, as the one person possessing authority to expel or suspend; advance inspection by the student of any affidavits or exhibits which the College intended to submit at the hearing; the student's right to have counsel present with him at the hearing; the right to present his version as to the charge and to make such showing by way of affidavits, exhibits, and witnesses as he desired; the right to hear the evidence against him and to question any witness giving adverse evidence; the president's determination of the facts solely on the evidence presented at the hearing and a statement by him in writing of his findings as to guilt or innocence of the conduct charged and the disposition, if any, to be made by way of disciplinary action; and permission to each side at its own expense to make a record of the events at the hearing. However, the students' request to be reinstated subject to the outcome of the hearing was denied. Esteban v. Central Missouri State College, 277 F.Supp. 649 (W.D.Mo.1967).
 
 
 15
 Thereafter, and in line with the court's directions, written charges and notice of hearing were served on Esteban and Roberds. The charge against Esteban read:
 
 
 16
 'You are hereby notified that you are charged with contributing to and participating in an unruly and unlawful mass gathering occurring on the 30th day of March, 1967, at and near Central Missouri State College in that you, the said, Alfredo Esteban, did resist efforts of one Dr. M. L. Meverden in dispersing said mass gathering, failed and refused to identify yourself to Dr. Meverden as requested and used vile and obscene language towards and threatened a resident assistant of the College at Foster-Knox Hall.'
 
 That against Roberds read:
 
 17
 'You are hereby notified that you are charged with contributing to and participating in an unruly and unlawful mass gathering occurring on or about the 29th and 30th days of March, 1967 at and near Central Missouri State College in that you, the said Stephen Craig Roberds, on the 5th day of February, 1967 directed correspondence to Mr. E. J. Cantrell of the Missouri Legislature evidencing your intention to participate in such mass gathering, did thereafter advise Dean Hollis Chalquist, Dean of Men, of your intention to participate in such demonstration at which time you were specifically advised that such participation would result in immediate suspension from Central Missouri State College and that you did thereafter continue to contribute to and participate in said mass gathering all of which actions were in violation of the terms and provisions of your disciplinary probation.'
 
 
 18
 The college regulations in effect at the time, and to the extent pertinent, provided:
 
 
 19
 'The conduct of the individual student is an important indication of character and future usefulness in life. It is therefore important that each student maintain the highest standards of integrity, honesty and morality. All students are expected to conform to ordinary and accepted social customs and to conduct themselves at all times and in all places in a manner befitting a student of Central Missouri State College.
 
 
 20
 'All students that enroll at C.M.S.C. assume an obligation to abide by the rules and regulations of the college as well as all local, state and federal laws.
 
 
 21
 'When a breach of regulations involves a mixed group, ALL MEMBERS ARE HELD EQUALLY RESPONSIBLE.
 
 
 22
 'Conduct unbefitting a student which reflects adversely upon himself or the institution will result in disciplinary action.'
 
 
 23
 'Mass Gatherings-- Participation in mass gatherings which might be considered as unruly or unlawful will subject a student to possible immediate dismissal from the College. Only a few students intentionally get involved in mob misconduct, but many so-called 'spectators' get drawn into a fracas and by their very presence contribute to the dimensions of the problems. It should be understood that the College considers no student to be immune from due process of law enforcement when he is in violation as an individual or as a member of a crowd.'
 
 
 24
 The hearing required by Judge Hunter's determination as to procedural due process took place on November 3, 1967. The president made findings generally along the lines of those made by Judge Hunter and which now have been adopted by the parties to this appeal, and reaffirmed the previous suspensions. As to Esteban:
 
 
 25
 'I am of the further opinion that this student's resistance to Dr. Meverden's efforts directed towards dispersing the demonstration contributed to the unruly and disorderly situation resulting from the demonstration and unquestionably constituted participation in the mass gatherings even though at the specific time of the occurrence the gathering was in the process of being dispersed.'
 
 As to Roberds:
 
 26
 '* * * Mr. Roberds has repeatedly admitted attending the demonstrations on both nights but qualifies his attendance as being that of a spectator and the evidence does not show otherwise. It is apparently the former student's position that his presence at the disturbances as a spectator does not constitute a violation of the College regulations relative to mass gatherings. I am of the opinion that it does. At the outset it should be made clear that the very purpose of the regulation is to prevent an unauthorized mass gathering of students which gatherings are by their very nature made up of a great number of spectators. It is the spectators that create the mass which in turn leads, as in this case, to incidents of unruly and violent action. If there were no so called spectators there would be no mass gathering.
 
 
 27
 'Furthermore, the regulation in this instance makes it clear that spectators will be considered to be contributing to the mass gathering and will be subject to similar disciplinary action.'
 
 
 28
 When the suspensions were thus affirmed, the present action was instituted by the plaintiffs.
 
 
 29
 We accept the statement, made by plaintiffs' counsel at oral argument, that the record is devoid of anything which indicates a connection between the two plaintiffs. Actually, so far as the record discloses, they may not even have known each other. We therefore treat their situations as separate and distinct.
 
 
 30
 The plaintiffs' argument appears to be (1) that the trial court's findings of fact are clearly erroneous; (2) that the college's regulation and action violated rights of freedom of speech and of peaceful assembly and to petition; and (3) that the regulation is so vague as to deny substantive due process.
 
 
 31
 1. The findings and the supportive evidence. Both sides, of course, acknowledge that the governing standard as to clear error, under Rule 52(a), Fed.R.Civ.P., is the usual one whether, on the entire evidence, one is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); O'Rieley v. Endicott-Johnson Corp., 297 F.2d 1, 6 (8 Cir. 1961). The Supreme Court, in Duberstein, emphasized that this rule 'itself applies also to factual inferences from undisputed basic facts.'
 
 
 32
 With this standard in mind we are drawn inevitably to the conclusion that Judge Hunter's findings were not clearly erroneous.
 
 
 33
 a. Esteban. This plaintiff, by the adoption of the trial court's findings of fact, now concedes that he left his dormitory as other students were proceeding along the street from the mass demonstration; that he proceeded toward the scene of the demonstration and within 100 feet thereof and 'stayed there awhile'; that he was requested by Doctor Meverden, a member of the college staff, to go into his dormitory; that Doctor Meverden was seeking to disperse the students; that he, Esteban, did not comply with these directions but asked more than once why he was being told to go in; that he insisted on his right to be out there; that in response to Meverden's request to produce his identification card he used rough language in his negative reply and refused to give his name; that he questioned Meverden's authority; that only with the encouragement of other students did he go in the dormitory; that Meverden then asked the dormitory resident who Esteban was; and that, when this information was given, Esteban responded with gutter language and with a threat and dumped a waste can's contents at the resident's feet.
 
 
 34
 Esteban's argument is that conduct not included within the charge is not relevant; that the charge of participation in an unlawful mass gathering was supported only by the specification of resisting Meverden's efforts to disperse and not at all by his refusal to identify himself or by the language he used toward the resident; that the evidence shows that Esteban was not involved in the demonstration or at its scene; that he was studying while it took place; that he was standing a half block away peacefully talking with other students when 'accosted' by Meverden; and that there was no college rule which gave Meverden the authority to order him into the dormitory.
 
 
 35
 We are not at all convinced by this attempted dissection of the aggregate facts. Moments before Esteban's purposeful entrance on the scene an unruly mass gathering had been in control at the intersection. The mob extended to the college premises. Destruction of college property had taken place. Innocent and unsuspecting members of the public had been stopped in their automobiles, had had their cars rocked, and had been ordered out by the mob. It was an explosive situation participated in by college students and affecting college property. Meverden was dispatched there in his capacity as a staff member and at the order of the college president in an attempt to restore order and thus to protect the students from further serious trouble. His assignment, obviously, was not the most enviable one. Just as obviously, the dispersal of the students and their return to the dormitories were effective remedies for a situation which had already erupted and which remained eruptive. Meverden's inquiry of Esteban was made with authority and with reason. He was met with the very attributes of the mob: defiance, challenge to his authority to ask people to move on, a refusal to reveal one's name, the language of a bully, and insults. This, it will be remembered, although perhaps not at that moment known to Meverden, was a student then on scholastic probation and only shortly before on disciplinary probation because of a knifing incident. We fail to see, understand, or comprehend Esteban's argument that there was no substantial evidence of misconduct encompassed within the charge against him. His actions, obviously, were in resistance to Meverden's reasonable efforts to disperse the students and to prevent the recurrence or continuance of mob action. In our view, Esteban by his resistance was a participant in the affair even though he may not have been one of those who actually interfered with the travel rights of others and who destroyed college property.
 
 
 36
 b. Roberds. This plaintiff's case differs factually from Esteban's. But, by the adopted findings, Roberds concedes that he had asked the dean about the result which would flow from his involvement in future demonstrations or disturbances; that he was informed, in response to that inquiry on his part, that any action which would reflect unfavorably upon him or the College, could be considered grounds for suspension; that he was 'present as a part of the crowd' on both evenings; that he was so present for a half hour on the first night and for an hour on the second night; that he discussed with others some of the things which were going on and expressed his 'disgust with the college'; that he returned to his dormitory only after the gathering was dispersed; and that he wrote the letter to the legislator.
 
 
 37
 Roberds' argument follows Esteban's to the point where it says that two of the three specifications of a charge failed to support that charge. Roberds then urges that his letter to the legislator is a first amendment petition 'for a redress of grievances'; that it does not at all support a finding of intent to participate in any unruly demonstration; that, anyway, intent alone is not participation; that he did not tell the dean he intended to participate; that he was not a ringleader and did not participate; that, instead, he was a mere spectator, standing and sitting 'on the sidewalk, watching the events'; that observing is not participating; and that observation is not enough.
 
 
 38
 We observe in this connection that we do not read Roberds' letter to his legislator as a mere petition for redress of grievances which he would have every right to compose and present. The letter specifies no grievance which we can ascertain. It speaks only of disgust and, as we have noted, it contains a flat threat. His right to write is not an issue. His intent and his participation are in issue.
 
 
 39
 Mere presence, under certain circumstances, has been held insufficiently representative of criminal involvement. See Barr v. City of Columbia, 378 U.S. 146, 150, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964); United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); Bozza v. United States, 330 U.S. 160, 162-164, 67 S.Ct. 645, 91 L.Ed. 818; (1947); Rollins v. Shannon, 292 F.Supp. 580, 590 (E.D.Mo.1968). Assuming, without deciding, that such criminal cases would afford precedent for a civil situation of the kind which confronts us, we note that the test as to the propriety of the inference to be drawn from presence is that of rational connection between the facts proved and the ultimate fact presumed. United States v. Romano, supra, 382 U.S. at 139, 86 S.Ct. 279; United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). That rational connection, we hold, is definitely present here.
 
 
 40
 Here, again, we are not persuaded as to Roberds' peaceful spectator status or that the court's findings as to him have no substantial support in the record. Roberds was present at, and as a part of, the milling mass on both nights. He was there as 'a part of the gathered crowd.' He, too, may not have stopped any automobile or rocked it or forced out its occupants or damaged property, but these incidents took place and were caused by the mob and he was a part of that mob. Mob action or, for that matter, the old style lynching action, always presents to the self-proclaimed 'spectator' the opportunity to claim that he was merely watching, that he did not participate, and that someone else did the job. But one may participate by being present and 'talking it up' as Roberds concededly did. And when this is buttressed by the intent evidenced from his letter's expressions of disgust and tyranny and his 'plan on turning this school into a Berkeley if * * *', we have, in our view, substantial and certainly adequate support for the inferences the trial court drew and for its findings.
 
 
 41
 2. The First Amendment rights. Having resolved the issue as to the sufficiency of the evidence against the plaintiffs, we then encounter the constitutional argument. Were their rights of free speech and of free assembly and to petition denied to them?
 
 
 42
 Obviously, one does not lose his first amendment rights by matriculation at a college. Those rights follow one through the classroom door and, as we have had occasion recently to observe, even, to a great extent, through a penitentiary's doors. Sharp v. Sigler, 408 F.2d 966, 970 (8 Cir. 1969); Jackson v. Bishop, 404 F.2d 571, 576 (8 Cir. 1968). And what better or more ideal place is there for free discussion and for the exchange of ideas than academic halls? See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).
 
 
 43
 Long settled, too, is the principle that the first amendment freedoms of speech and of association are applicable to the states, either by the due process route of the fourteenth amendment or directly under the first amendment. See, for example, Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937); Thornhill v. Alabama, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).
 
 
 44
 On this issue, however, we need look no further than a recent decision of the Supreme Court concerning the application of first amendment rights in the academic environment. In Tinker v. Des Moines Ind. School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), a case from this circuit, the Court first observed,
 
 
 45
 'First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.' 393 U.S. at 506, 89 S.Ct. at 736.
 
 
 46
 and then held that the quiet and passive wearing by students of black armbands to protest government policy in Vietnam was within the protection of the Free Speech and Due Process Clauses of the first and fourteenth amendments. But the emphasis in the majority opinion is evident from the following:
 
 
 47
 '* * * As we shall discuss, the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it.
 
 
 48
 '* * * On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school authorities, consistent with fundmental constitutional safeguards, to prescribe and control conduct in the schools. Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities.
 
 
 49
 '* * * It does not concern aggressive, disruptive action or even group demonstrations. Our problem involves direct, primary First Amendment rights akin to 'pure speech.'
 
 
 50
 'The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students.
 
 
 51
 '* * * Outside the classrooms, a few students made hostile remarks to the children wearing armbands, but there were no threats or acts of violence on school premises.
 
 
 52
 'In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.
 
 
 53
 '* * * When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason-- whether it stems from time, place, or type of behavior-- materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.
 
 
 54
 '* * * The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances.
 
 
 55
 'As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred'. 393 U.S. 505, 507-509, 512-514, 89 S.Ct. 737-738, 740.
 
 
 56
 That emphasis is on the absence of 'actually or potentially disruptive conduct' by the participants; on the need of school officials, consistent with constitutional safeguards, 'to prescribe and control conduct in the schools'; on 'a silent, passive expression' unaccompanied by any disorder or disturbance; on the absence of evidence of interference with the school's work or with 'the rights of other students to be secure and to be let alone'; on the absence of threats or acts of violence on school premises; on the absence of a finding of material interference 'with the requirements of appropriate discipline in the operation of the school'; and on the absence of material disruption of classwork or 'substantial disorder or invasion of the rights of others.' It is obvious that where there is actual or potentially disruptive conduct, or disorder or disturbance by the petitioners, or interference with the work of the school or of the rights of other students, or threats or acts of violence on the school premises, or substantial disorder, then reasonable action by school authorities is constitutionally permitted. There must, however, be more than mere fear and apprehension of possible disturbance.
 
 
 57
 This emphasis, and the distinction between what is constitutionally permissible and what is not, is also apparent in the Court's denial of certiorari, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217, in Barker v. Hardway, 399 F.2d 638 (4 Cir. 1968), a per curiam opinion which in turn had affirmed the dismissal of an action to enjoin enforcement of suspension of state college students. 283 F.Supp. 228 (S.D.W.Va.1968). Mr. Justice Fortas, who wrote the majority opinion in Tinker, concurred in the denial of certiorari in Barker with observations that the Barker petitioners were suspended 'not for expressing their opinions on a matter of substance, but for violent and destructive interference with the rights of others', and that the findings established that the petitioners were 'engaged in an aggressive and violent demonstration, and not in peaceful, nondisruptive expression.' Their conduct, therefore, was 'clearly not protected by the First and Fourteenth Amendments.'
 
 
 58
 So it is here. Judge Hunter's findings have been quoted above. We have found them sufficiently supported by the record. They, too, concern an aggressive and violent demonstration and something quite apart from 'peaceful, nondisruptive expression.' They, too, focus upon 'destructive interference with the rights of others.' They disclose actual or potentially disruptive conduct, aggressive action, disorder and disturbance, and acts of violence and participation therein by these plaintiffs. Their conduct, therefore, was not protected by the first and fourteenth amendments.
 
 
 59
 3. The regulations. These are additionally attacked for vagueness and overbreadth and hence on substantive due process grounds. Some of the loyalty oath cases are cited and it is said that the regulations' word 'unlawful' is only a legal conclusion and that their references to 'unruly' and 'spectators' and 'which might be considered' are undefined and possess no standards. The regulations are likened to city ordinances which have been struck down when they lack sufficiency of definition. It is then argued that 'young people should be told clearly what is right and what is wrong, as well as the consequences of their acts.' Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and other cases are cited. Finally, it is said that the regulations impinge and have a chilling effect upon first and fourteenth amendment rights.
 
 
 60
 The answers to all this, we think, are several. First, the college's regulations, per se, do not appear to us to constitute the fulcrum of the plaintiffs' discomfiture. The charges against Esteban and Roberds did not even refer to the regulations. Roberds was disciplined because he had participated in the demonstrations in the face of specific warning delivered by personal interview with the dean. This was defiance of proper college authority. Esteban was disciplined because of his refusal to comply with an appropriate request by Doctor Meverden and because of his childish behavior and obscenity toward college officials. This, too, was defiance of proper college authority. There was no confusion or unawareness in either case. The exercise of common sense was all that was required. Each plaintiff knew the situtation very well, knew what he was doing, and knew the consequences. Each, we might note, had had prior disciplinary experience. Their respective protestations of young and injured innocence have a hollow ring.
 
 
 61
 Secondly, we agree with Judge Hunter that it is not sound to draw an analogy between student discipline and criminal procedure, that the standard of conduct which a college seeks to impose must be one relevant to 'a lawful mission, process or function of the educational institution', and that,
 
 
 62
 '* * * Certainly the regulation concerning mass demonstrations, reasonably interpreted, and as interpreted and applied by the college in the instant case to a participant in student mass demonstrations involving unlawful conduct such as the illegal blocking of a public highway and street, and the destruction of school property, is relevant to a lawful mission of the educational institution.' 290 F.Supp. at 629.
 
 
 63
 Thirdly, we do not find the regulation at all difficult to understand and we are positive the college student, who is appropriately expected to possess some minimum intelligence, would not find it difficult. It asks for the adherence to standards of conduct which befit a student and it warns of the danger of mass involvement. We must assume Esteban and Roberds can read and that they possess some power of comprehension. Their difficulty was that they chose not to read or not to comprehend.
 
 
 64
 Fourthly, we see little basically or constitutionally wrong with flexibility and reasonable breadth, rather than meticulous specificity, in college regulations relating to conduct. Certainly these regulations are not to be compared with the criminal statute. They are codes of general conduct which those qualified and experienced in the field have characterized not as punishment but as part of the educational process itself and as preferably to be expressed in general rather than in specific terms. See E. Williamson and J. Foley, Counseling and Discipline, 79-83 (1949); E. Williamson, Student Personnel Services in Colleges and Universities, 166 (1961); Brady and Snoxell, Student Discipline in Higher Education 10 (Student Personnel Series No. 5, The American College Personnel Association (1965)).
 
 
 65
 We agree with those courts which have held that a school has inherent authority to maintain order and to discipline students. State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822, 827 (1942), cert. denied, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703; Jones v. State Bd. of Educ., 279 F.Supp. 190, 202 (M.D.Tenn.1968), aff'd 407 F.2d 834 (6 Cir.1969); Buttny v. Smiley, 281 F.Supp. 280, 285, 286 (D.Colo.1968); Zanders v. Louisiana State Bd. of Educ., 281 F.Supp. 747, 757 (W.D.La.1968); Barker v. Hardway, supra, 283 F.Supp. at 235. We further agree that a school has latitude and discretion in its formulation of rules and regulations and of general standards of conduct. Goldberg v. Regents of University of Cal., 248 Cal.App.2d 867, 57 Cal.Rptr. 463, 472 (Ct.App.1967); Dickey v. Alabama State Bd. of Educ., 273 F.Supp. 613, 618 (M.D.Ala.1967); Jones v. State Bd. of Educ., supra; Buttny v. Smiley, supra; Cornette v. Aldridge, 408 S.W.2d 935, 941 (Tex.Civ.App.1966).
 
 
 66
 We regard as quite distinguishable cases such as Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967), and Dickey v. Alabama State Bd. of Educ., supra, where the focus was on an attempted restraint of peaceful assembly or speech. Our attention has been called to the fact that Judge Doyle, in his recent opinion in Soglin v. Kauffman, 295 F.Supp. 978, 990-991 (W.D.Wis.1968), expresses disagreement with the observations of Judge Hunter on this aspect of the case. To the extent that, in this area, Judge Doyle is in disagreement with Judge Hunter, we must respectfully disagree with Judge Doyle.
 
 
 67
 The appellants argue, to what exact purpose we are not sure, that attendance by a Missouri resident at a publicly supported educational institution of his state is an important right. We are not certain that it is significant whether attenance at such a college, or staying there once one has matriculated, is a right rather than a privilege. Education, of course, is vital and valuable, Brown v. Board of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and remaining in college in good standing, much like reputation, is also something of value. Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157 (5 Cir.1961), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. So, too, is one's personal freedom. But one may act so as constitutionally to lose that freedom. And one may act so as constitutionally to lose his right or privilege to attend a college.
 
 
 68
 College attendance, whether it be a right or a privilege, very definitely entails responsibility. This is fundamental. It rests upon the fact that the student is approaching maturity. His elementary and secondary education is behind him. He already knows, or should know, the basics of decent conduct, of nonviolence, and of respect for the rights of others. He already knows, or should know, that destruction of property, threats to others, frightening passersby, and intrusions upon their rights of travel are unacceptable, if not illegal, and are not worthy of one who would pursue knowledge at the college level.
 
 
 69
 These plaintiffs are no longer children. While they may have been minors, they were beyond the age of 18. Their days of accomplishing ends and status by force are at an end. It was time they assumed at least the outward appearance of adulthood and of manhood. The mass denial of rights of others is irresponsible and childish. So is the defiance of proper college administrative authority ('I have the right to be here'; 'I refuse to identify myself'; gutter abuse of an official; the dumping of a trash can at a resident's feet; 'I plan on turning this school into a Berkeley if * * *'; and being a part of the proscribed college peace-disturbing and property-destroying demonstration). One might expect this from the spoiled child of tender years. One rightly does not expect it from the college student who has had two decades of life and who, in theory, is close to being 'grown up.'
 
 
 70
 Let there be no misunderstanding as to our precise holding. We do not hold that any college regulation, however loosely framed, is necessarily valid. We do not hold that a school has the authority to require a student to discard any constitutional right when he matriculates. We do hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct; that, as to these, flexibility and elbow room are to be preferred over specificity; that procedural due process must be afforded (as Judge Hunter by his first opinion here specifically required) by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures; that school regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedure; and that the courts should interfere only where there is a clear case of constitutional infringement.
 
 
 71
 After all, the test, we feel, is that of reasonableness. Dickey v. Alabama State Bd. of Educ., supra, 273 F.Supp. at 618. On that standard we perceive here no denial of constitutional rights of Esteban or of Roberds. If these two plaintiffs are really serious in what is said to be their protestations of desire to complete their college education, we naturally assume that they will apply for readmission. We are mildly surprised that they have not done this as yet. We also assume, of course, that the College will view their applications, if and when they are ever submitted, with the respect and deferences to which they are entitled.
 
 
 72
 Affirmed.
 
 LAY, Circuit Judge (dissenting):
 
 73
 I respectfully dissent. First, and foremost, I reject the overall thesis of the district court, as acquiesced in by the majority opinion, that a federal court has jurisdiction under the Civil Rights Act to review student discipline by school officials. I generally agree with the district court's statement that it should not assume jurisdiction in student disciplinary cases under the Civil Rights Act unless there appears one of the following:
 
 
 74
 '(1) A deprival of due process, that is, fundamental concepts of fair play;
 
 
 75
 '(2) Invidious discrimination, for example, on account of race or religion;
 
 
 76
 '(3) Denial of federal rights, constitutional or statutory, protected in the academic community; or
 
 
 77
 '(4) Clearly unreasonable, arbitrary or capricious action.' 290 F.Supp. at 631.
 
 
 78
 However, I reject the district court's procedural approach of reviewing the sufficiency of the evidence of the disciplinary proceedings conducted by school officials. The trial court has posited this test to be:
 
 
 79
 'A federal district court will in appropriate circumstances review a student disciplinary proceeding to determine if the challenged disciplinary action was on grounds lacking support by any substantial evidence.'[1] 290 F.Supp. at 631.
 
 
 80
 In an action under 42 U.S.C. 1983 of the Civil Rights Act, federal jurisdictional proof must relate to the denial of a federal right under color of state law. A complaint filed under civil rights law does not embrace a 'review' to determine the existence of 'substantial evidence' of any state proceeding. This approach attempts to place state school officials in the same role as a federal administrative agency subject to the Administrative Procedure Act, 5 U.S.C. 551 et seq. (1966). See e.g., the same standard of review this court recently applied to the findings of the Federal Aviation Administrator. Doe v. Department of Transp., 412 F.2d 674 (8 Cir. July 16, 1969). The district court's theory of review in essence misconstrues the very purpose of the civil rights legislation as it relates to state action. The Civil Rights Act was not intended to broaden the Administrative Procedure Act so as to include review of state agencies.[2] The Administrative Procedure Act can only encompass 'authority of the Government of the United States.' The majority opinion here treats the district court's opinion as setting forth 'findings of fact.' However, it is clear that the district court's opinion sets forth merely a 'summary' of the evidence in the school proceeding and the legal conclusion that there was 'substantial evidence' to support the president's findings.
 
 
 81
 A civil rights action under 1983 is a separate proceeding which requires a trial de novo on the claim relating to a denial of federal rights. Cf. Barker v. Hardway, 399 F.2d 638 (4 Cir. 1968), cert. denied, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969). It does not authorize 'appellate' review. The parties may choose to furnish evidence by stipulation from prior transcripts in extra or quasi-judicial proceedings. However, in an action filed under 1983 a district judge is not bound by a prior findings of fact of any state official. It would be incongruous to say that the state determination of the constitutionality of its own action can bind a federal court even though there be 'substantial evidence' to support the state official's finding. This would make the 'statedefendant,' who is the 'accused,' the self-arbiter and 'judge' of its own conduct. The Civil Rights Acts do not authorize a federal district court to decide a plaintiff's claim on the basis that there is or is not 'substantial evidence' supporting the finding of a state official. A federal district court is clearly obligated to make its own findings from the evidence submitted. In an action under 1983 a plaintiff has the burden of proving his allegations under the same standards as in any other civil case. The district court's mission is to make findings of fact and conclusions of law as to whether in fact or in law state action has denied to a plaintiff any federal right. There is a fundamental difference between a court sitting in review to pass upon the 'substantiality' of evidence and its acting as the fact finder itself. Cf. Universal Camera Corp. v. NLRB, 340 U.S. 474, 480 n. 12, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Federal courts do not belong in the hierarchy of state educational institutions as a supreme board of review to weigh evidence as to an institution's disciplinary rulings. Public education is within the control of state and local officials and should remain there. We are in agreement that principles of federalism do not justify federal court intervention in the daily operation of school systems and the resolution of problems which are remote from federal rights. These principles should make clear that federal courts do not possess the competence in the field of public education to moralize, lecture or otherwise review the evidence resulting in discipline of students by school officials. This is not the purpose of the Civil Rights Act. To hold that it is, truly arrogates to federal courts that which is a function of the states themselves. And conversely, but of greater significance, a federal judge should not yield his jurisdiction or competency to protect fundamental liberties of individual citizens to a school administrator.
 
 
 82
 If there existed on the present record conflicting evidence as to the denial of a federal right, I would remand these cases to the district court for a finding of fact and judgment on the merits. This would require specific findings of fact by the district court as to whether a federal right was improperly denied by state action. I would recommend a direction that the trial court's findings are not to constitute in any form a conclusory review as to the sufficiency of the evidence in the school proceedings. However, based upon the evidence here, and for different reasons and results, I do not find a remand necessary in either the Esteban or Roberds case.
 
 
 83
 In the Esteban case, based upon the record before us, there is no evidence involving the denial of a federal right. According to Dr. Lovinger, Esteban was expelled from a state school for (1) insubordination growing out of a request by a school official to have Esteban return to his dormitory at a time when there had been campus disturbances nearby, (2) using, at that time, vile and obscene language toward college officials and (3) threatening a resident assistant of the college. There exists no denial of federal rights in these facts. There cannot exist a claim that there is 'no basis in fact' to support the above charges in view of Esteban's own admission of these facts. Cf. Freeman v. Gould Special Sch. Dist., 405 F.2d 1153, 1161 (8 Cir. 1969) (dissenting opinion).[3] Esteban claims he was charged with participation in the unlawful demonstration and that there exists no evidence to support this charge. However, it is clear that his dismissal was actually based upon the incidents (also charged) following Dr. Meverden's request that he return to his dormitory. Esteban, although asserting a denial of First Amendment rights has not shown any proof that he was denied any freedom to speak or of assembly. He asserts he was not an active participant in any disturbance and therefore concludes that it was improper for school officials to order him to his dormitory. Dr. Meverden's assigned job was to break up the demonstration which had involved violent acts by some students. In order to accomplish this he requested students to go to their dormitories. Such action by university authorities is not so unreasonable that it may be considered as violating First Amendment rights. If a state school chooses to discipline a student for conduct disrespectful to faculty members, there is no federal right involved.
 
 
 84
 This brings me to Roberds. It is once again clear that the district court's judgment was erroneously premised upon its review as to the sufficiency of the evidence to support Dr. Lovinger's finding. Again I submit that the trial in the district court should have been a de novo determination as to whether or not Roberds' federal rights were denied. Plaintiff simply had the burden of proving, by the preponderance of evidence, that his federal rights were denied. No party need show the presence or absence of 'substantial evidence,' whatever that term may mean here, to support the president's finding. Where basic constitutional values are involved a federal court is not invading the realm of school administration but dealing with rights which attach to every citizen. Justice Jackson made this clear in West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 639-640, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943):
 
 
 85
 'Nor does out duty to apply the Bill of Rights to assertions of official authority depend upon our possession of marked competence in the field where the invasion of rights occurs. * * * we act in these matters not by authority of our competence but by force of our commissions. We cannot, because of modest estimates of our competence in such specialties as public education, withhold the judgment that history authenticates as the function of this Court when liberty is infringed.'
 
 
 86
 As set forth in Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), school officials may not deprive students of basic liberties unless the exercise of that liberty disrupts classwork or involves substantial disorder or constitutes an invasion of the rights of others. As the Supreme Court said:
 
 
 87
 'Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.' 393 U.S. at 511, 89 S.Ct. at 739.
 
 
 88
 However, once again it should not be necessary to remand for proper findings. The evidence is undisputed as to the events surrounding Roberds' conduct. There is no evidence whatsoever to show that Roberds was a 'participant' in any unlawful disturbance or illegal demonstration. The district court concluded that 'from all the evidence Dr. Lovinger could reasonably infer Roberds was a participant and not a mere, or innocent, spectator.' 290 F.Supp. at 631. The difficulty with this conclusion is that Dr. Lovinger, who conducted the only evidential hearing, found just to the contrary.[4]
 
 Dr. Lovinger held:
 
 89
 'Under these circumstances Mr. Roberds has repeatedly admitted attending the demonstrations on both nights but qualifies his attendance as being that of a spectator and the evidence does not show otherwise. It is apparently the former student's position that his presence at the disturbances as a spectator does not constitute a violation of the College regulations relative to mass gatherings. I am of the opinion that it does.'
 
 
 90
 This conclusion was in part consistent with the university's regulation which read:
 
 
 91
 'Mass Gatherings-- Participation in mass gatherings which might be considered as unruly or unlawful will subject a student to possible immediate dismissal from the College. Only a few students intentionally get involved in mob misconduct, but many so-called 'spectators' get drawn into a fracas and by their very presence contribute to the dimensions of the problems. It should be understood that the College considers no student to be immune from due process of law enforcement when he is in violation as an individual or as a member of a crowd.'
 
 
 92
 The president commented on this regulation:
 
 
 93
 'At the outset it should be made clear that the very purpose of the regulation is to prevent an unauthorized gathering of students which gatherings are by their very nature made up of a great number of spectators. It is the spectators that create the mass which in turn leads, as in this case, to incidents of unruly and violent action. If there were no so called spectators there would be no mass gathering. 'Furthermore, the regulation in this instance makes it clear that spectators will be considered to be contributing to the mass gathering and will be subject to similar disciplinary action.'
 
 
 94
 The difficulty with President Lovinger's viewpoint is, in part at least, that it is basically contrary to constitutional principles of free speech and free assembly.
 
 
 95
 However, the district court points out as part of the 'substantial evidence' to sustain Dr. Lovinger's supposed conclusion that Roberds was a 'participant' and not a 'spectator' the following statements:[5]
 
 
 96
 (1) 'Earlier he (Roberds) had inquired as to what would happen if he were to be a participant. This is indicative of his interest in being a participant.'
 
 
 97
 (2) 'He wrote a letter to Representative Cantrill indicating he was considering action not consistent with that of being a mere spectator.'
 
 
 98
 (3) 'He witnessed the unlawful and destructive actions over a substantial period of time on two evenings and did not withdraw and disassociate on either of them from the unruly and destructive group.' F.Supp. at 631.
 
 
 99
 I respectfully submit that none of these observations are evidence of 'participation' by Roberds in an unlawful disturbance which in any way 'disrupts classroom work' or 'involves substantial disorder' or is an 'invasion of rights of others.' Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).
 
 
 100
 The majority opinion adds to the evidence the finding that Roberds 'talked it up' by talking to others in the crowd. The evidence reflects that Roberds attended the demonstration for one-half hour one night and one hour the next. Roberds' supposed admission is his candid statement that he 'mentioned my disgust with the college, and we talked, as the people I had talked to had the same feeling.' Apropos here is the statement in Tinker, supra, at 511, 89 S.Ct. at 739.
 
 
 101
 'In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit said, school officials cannot suppress 'expressions of feelings with which they do not wish to contend.' Burnside v. Byars, supra, 363 F.2d at 749.'The only evidence as to Roberds' conversations contradict the 'finding' of the majority that he in any way 'talked it up.' Roberds testified:
 
 
 102
 'On the nights of March 29 and 30, I was present at the demonstrations as a spectator. I did not participate in any activity. I did not cause any damage to any property. I encouraged no one to cause any damage to any property. I was merely a spectator. I feel I violated no state, local or federal laws.
 
 
 103
 'Mr. Achtenberg: Did you at any time advise Dean Chalquist that you intended to participate in any such demonstration?
 
 
 104
 'Stephen Roberds: No, I did not.
 
 
 105
 'Mr. Achtenberg: And did you participate in any such demonstrations?
 
 
 106
 'Stephen Roberds: No I did not.'
 
 
 107
 This is no evidence that Roberds encouraged or incited any act of misconduct which in any way 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.' Tinker, supra, at 509, 89 S.Ct. at 738.
 
 
 108
 Dr. Lovinger clearly had the authority to warn students that their participation in an unruly demonstration would subject them to disciplinary action. His observation and warning that students as spectators are often drawn into unruly demonstrations and that when they so participate they would be disciplined is beyond doubt a proper one. However, to suggest by regulation that anyone present at any demonstration which might become unruly may be punished, smacks of 'prior restraint' and cannot be condoned. '(A) state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions.' Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940). 'Prior restraint' on free expression and assembly is not permissible in any form. Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), and see particularly J. Black's concurring opinion; Carroll v. President and Commissioners, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1944); cf. Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967). A university or college cannot constitutionally place a ban on all student demonstrations simply because they may incite some students to unlawful Acts. As the Supreme Court stated in Tinker, supra at 508-509, 89 S.Ct. at 737:
 
 
 109
 'But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom or on the campus, that deviates from the views of another person, may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1959); and our history says that it is this sort of hazardous freedom-- this kind of openness-- that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious society.'
 
 
 110
 In Thomas v. Collins, supra, the State of Texas attempted to prohibit union solicitation by distinguishing it from other forms of speech. This was accomplished by examining the understanding of the listener. The Supreme Court quickly reacted, as we should here:
 
 
 111
 '(This) puts the speaker * * * wholly at the mercy of the varied understandings of his hearers. * * * Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. * * * The effort to observe it could not be free speech, free press, or free assembly, in any sense of free advocacy of principle or cause. The restriction's effect, as applied, in a very practical sense was to prohibit.' 323 U.S. at 535-536, 65 S.Ct. at 325.
 
 
 112
 To hold each demonstrator or spectator at any mass demonstration responsible for the conduct of every other person present would place in jeopardy all rights of individuals to gather for peaceful petition. No individual could determine in advance whether a demonstration would be peaceful. As has been observed, 'The facts in any case involving a public demonstration are difficult to ascertain and even more difficult to evaluate.' Carroll v. President and Commissioners, 393 U.S. 175, 183, 89 S.Ct. 347, 353, 21 L.Ed.2d 325 (1968). A peaceful demonstrator would always be faced with the alternatives of remaining at home or risking vicarious punishment for the violent actions of other demonstrators or even onlookers. This was recognized in Barr v. City of Columbia, 378 U.S. 146, 150, 84 S.Ct. 1734, 1737, 12 L.Ed.2d 766 (1964), where the Court said of a group of peaceful demonstrators:
 
 
 113
 'The only evidence to which the city refers to justify the breach-of-peace convictions here, and the only possible relevant evidence which we have been able to find in the record, is a suggestion that petitioners' mere presence seated at the counter might possibly have tended to move onlookers to commit acts of violence. * * * (we reverse the conviction) * * * because of the frequent occasions on which we have reversed under the Fourteenth Amendment convictions of peaceful individuals who were convicted of breach of the peace because of the acts of hostile onlookers * * *.'
 
 
 114
 Presence alone, without any showing that the individual encouraged, incited, promoted or took part in a violent disturbance will not sustain a finding that he is a rioter. Cf. Rollins v. Shannon, 292 F.Supp. 580 (E.D.Mo.1968); Hunter v. Allen, 286 F.Supp. 830 (N.D.Ga.1968); People v. Bundte, 87 Cal.App.2d 735, 197 P.2d 823 (1948). See also Judge Oliver's opinion in Scoggin v. Lincoln Univ., 291 F.Supp. 161 (W.D.Mo.1968). To hold otherwise, in my opinion, violates every basic principle of due process the law is known to embrace.
 
 
 115
 I respectfully submit the evidence supports only the finding that Dr. Lovinger made: that Roberds was a mere spectator and was merely present at the demonstration. Furthermore, the evidence is clear that the school did not discipline Roberds for being a participant in an 'unlawful mass gathering' (although he was so charged) but for simply being present at the time others engaged in alleged unlawful acts. Herein should lie the importance of this decision. Mere presence at a demonstration is not and cannot be the basis for university regulations which attempt by 'prior restraint' to prevent demonstration itself. Nor can it be the basis for state exclusion from educational opportunity.
 
 
 116
 In my opinion this constitutes a governmental encroachment on the exercise of free speech and free assembly and is incompatible with the Constitution of the United States. Roberds should be granted appropriate relief.
 
 
 
 [1]
 Counsel at oral argument advised us that Esteban was in VISTA and that he did not know the whereabouts of Roberds
 The defendants in their brief say the expiration date of the two semester suspension was August 18, 1967. We readily conclude that the passage of the two semesters does not render the case moot. See Carafas v. La Vallee, 391 U.S. 234, 237-240, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), and Sibron v. New York, 392 U.S. 40, 50-58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
 
 
 [2]
 This is an obvious error. The date is March 30 and was so stated in the charge and by the witnesses at the hearing before the president, hereinafter referred to
 
 
 [1]
 Presumably, this last statement is based upon the district court's 'General Order On Judicial Standards Of Procedure And Substance In Review of Student Discipline In Tax Supported Institutions Of Higher Education.' 45 F.R.D. 133 (1968). This same standard of review is erroneously compounded in other cases from the same district, see e.g., Scoggin v. Lincoln Univ., 291 F.Supp. 161 (W.D.Mo.1968)
 
 
 [2]
 One law review authority indicates that 'It is well settled that the student has a right to appeal the determination by the university adjudicatory system to a state or federal court for review.' Johnson, Constitutional Rights of College Students, 42 Texas L.Rev. 344, 361 (1964). The author relies upon Davis, Administrative Law 7.10 (1958). Davis does not support this view nor does the federal case cited: Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5 Cir. 1961). Dixon is based solely upon 1983 and the prerequisite allegation of denial of federal rights by state action
 
 
 [3]
 If the district court's 'substantial evidence' test is intended as one that simply seeks to determine whether the state action had 'basis in fact,' then the district court has still procedurally erred. A de novo trial under the Civil Rights Act on whether there is 'no basis in fact'* to support a school expulsion, does not involve a review of the sufficiency of the evidence in the school proceedings. A de novo trial again requires separate factual findings by the federal district court. Furthermore, a determination that there is or is not a 'basis in fact' is a far different test than a judicial inquiry as to whether there exists 'substantial evidence.' See Dickinson v. United States, 346 U.S. 389, 396, 74 S.Ct. 152, 98 L.Ed. 132 (1953). See discussion in Davis, Administrative Law 29.07 (1958)
 
 
 *
 This assumes, of course, that an allegation of 'no basis in fact' for state action constitutes a stated claim for relief under the Civil Rights Act. The majority opinion in Freeman v. Gould Special Sch. Dist., 405 F.2d 1153 (8 Cir.1969), disagrees with this view
 
 
 [4]
 It is significant, to me at least, that the trial court is not making an independent finding of 'participation,' but concluding that there was 'substantial evidence' to support Dr. Lovinger's finding. If the trial court's review was procedurally sound, which I dispute, it nevertheless would be in error, since as discussed, Dr. Lovinger concluded that Roberds was nothing more than a spectator. However, the issue was not whether the evidence would allow Dr. Lovinger to find Roberds was a participant in unlawful acts but whether in fact Roberds was or was not one
 
 
 [5]
 The opinion of the trial court likewise relies upon Roberds' testimony in the first hearing. The district court states in his opinion:
 'Although later in the same hearing he said he was only a spectator, he testified:
 "Q. And Dr. Lovinger asked you if you were there and participated in these demonstrations on March 29th and March 30th, did he not? A. Yes, sir. Q. And you told him that you had, did you not? A. Yes, sir. Q. And you are telling this Court that now, are you not? A. Yes." 290 F.Supp. at 631 n. 9.
 However, Roberds' statement cannot in all fairness be treated as an admission. The following questions and answers immediately follow the above portion quoted in the transcript:
 'THE COURT: Excuse me. So that there is no mistake about it, the question was that you were present and participated. Is that what you told him?
 'THE WITNESS: No.
 '(By Mr. Wesner) All right. What did you tell him?
 'THE COURT: What did you tell him? What did you tell both of these gentlemen? Start with the first.
 'THE WITNESS: I told Dr. Chalquist that I was present both evenings. I told President Lovinger that I was present both evenings.
 '(By Mr. Wesner) And what did you tell him that you did if anything, so far as the demonstrations were concerned?
 'THE WITNESS: I was a spectator, I told both men.'