James P. CORNETTE et al., Appellants,

v.

Darrel ALDRIDGE, Appellee.

No. 7657.

Court of Civil Appeals of Texas.

Amarillo.

Nov. 7, 1966.

Rehearing Denied Dec. 12, 1966.

See also, Tex.Civ.App., 404 S.W.2d 138.

Waggoner Carr, Atty. Gen., Hawthorn Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., J. C. Davis and Pat Bailey, Asst. Attys. Gen., Austin, Grady Hazlewood, Amarillo, for appellants.

Jack Hazlewood, Amarillo, for appellee.

PER CURIAM.

This is an appeal by officials of West Texas State University[1] in their hereinafter named and designated capacities from a writ of mandamus issued by the district court directing and commanding that they recognize Darrel Aldridge as a student at said school and " * * * permit him to participate in all courses of instruction for which he was then registered and all functions and activities to which his registration as a student would have entitled him." The application for mandamus was filed by Aldridge after he had been placed on disciplinary probation by Dr. T. Paige Carruth, Dean of Student Life, violated the conditions of such probation and after a hearing before a faculty committee composed of Dr. Wendell Cain, Dr. C. C. Callerman, Dr. J. L. Russell, Dr. R. C. Busteed and Dr. Carruth, as chairman, indefinitely suspended, effective February 3, 1966.

Darrell Aldridge was relator in the court below and respondents were Dr. James P. Cornette, President of the university named, Dr. Walter H. Juniper, Dean; Dr. T. Paige Carruth, Dean of Student Life; and the Board of Regents, State Senior Colleges of Texas.[2] The parties, for convenience, will be referred to by their names or as relator and respondents as in the court below.

Article 2647, Vernon's Ann.Tex.Civ.St., provides, inter alia, that the Board of Regents " * * * *shall have power to formulate and establish such rules for the general control and management of the State normal schools * * * as in their opinion may be necessary for the efficient administration of such schools."*

Article 2647a provides in Section 3 that: "The Board of Regents [of the Teachers' Colleges of Texas] is hereby authorized and empowered to adopt such rules and regulations requiring any class or classes of students to reside in such dormitories, or other buildings, as they may deem advisable. Absolute management and control of dormitories constructed under the provisions of this Act are vested in said Board of Regents."

█ It is thus seen that the legislature has vested in the Board of Regents of the subject institution broad and general power and authority to control and manage the school and establish such rules and regulations as shall be deemed necessary for the efficient administration of the institution. Relator in his petition for a writ of mandamus admits that the duly constituted officials of West Texas State University (which were respondents in the court below) are charged with the responsibility of supervising the discipline of the University students.

All emphases, brackets and parenthetical statements are ours unless otherwise noted.

We believe the principal and decisive, questions presented are whether the trial court substituted its discretion for the statutory discretion vested in the officials of the school, if such officials acted unreasonably, arbitrarily and capriciously by indefinitely suspending relator, and if the trial court had the authority to order such officials to perform a discretionary function in a particular manner. These questions are included in respondents' first three points and replied to in relator's first point in which he contends the officials in suspending him acted unreasonably, arbitrarily and capriciously.

1. The school is one of the several institutions of higher learning in the state formerly known as State Normal Schools and/or Teachers' Colleges of Texas. This one was later known as West Texas State College and by Acts 1963, 58th Leg., p. 60, ch. 40, changed to the name of West Texas State University in what is now Article 2647d.

2. Article 2644a, V.A.T.S., changed the name of Board of Regents of the State Teachers' Colleges to Board of Regents, State Senior Colleges.

The record shows that during the course of making the ruling granting Aldridge's petition for a writ of mandamus against the school officials the court made the following statements:

"The relator is no credit to himself or to the University, and I do not commend him for his conduct; but I do say that I think the University might well have shown mercy because this is a mark as bad as a felony on a man's record—something that can not be erased; and if he ever hopes to be a professional man it will follow him the rest of his life.

"This kind of punishment is not to be administered in any case unless as a last resort.

"It appears to me that in this case the authorities finally lost patience with this young man, whose punishment was long overdue, and cumulated it until the punishment became unreasonable.

"I regret that the University cannot find enough charity in their hearts to forgive him."

In the first place we cannot agree that an indefinite suspension from an institution of higher learning leaves a mark on one's record as bad as a conviction of a felony. It is common knowledge that many boys have been suspended from school, later reinstated, and after learning to conform to proper adult behavior completed their education and made successful business and professional men. Dr. Cornette, President of the University, advised Aldridge's parents by a letter that "* * * it is the general practice among such institutions to consider the reinstatement of a suspended student if and when there is evidence of sufficient changes in the suspended individual's attitude and conduct as to constitute a reasonable probability that the student's behavior would be acceptable if he were reinstated."

Considering the record of conduct hereinafter related we also cannot agree with the trial court's statement that the officials showed a lack of charity in their hearts in dealing with Aldridge.

However, the important legal matter shown by such statements of the court in issuing the harsh remedy of mandamus against the officials is that the court recognized the conduct of Aldridge was a discredit both to himself and to the school, that punishment was long overdue, but he felt personally that the punishment was too harsh. The court, therefore, showed by such statements that it was exercising its discretion for that vested in the school officials.

The Supreme Court of Texas in Foley v. Benedict, 122 Tex. 193, 55 S.W.2d 805, 86 A.L.R. 477 dealt with the material questions involved in the points under discussion. After stating in effect that where the legislature establishes a university and delegates the power *to make rules and regulations necessary to the government of the school to the Board of Regents such Board is invested with the power of determining what classes shall attend, provided such rules and regulations must be reasonable and not arbitrary,* it then held, in quoting from another authority, as follows:

" 'The courts will not interfere with the exercise of discretion by school directors in matters confided by law to their judgment, *unless there is a clear abuse of the discretion,* or a violation of law. So *the courts * * * will not consider whether the regulations are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the board.* Acting reasonably within the powers conferred, it is the province of the board of education to determine what things are detrimental to the successful management, good order, and discipline of the schools * * *. *The presumption is always in favor of the reasonableness and propriety of a rule or regulation duly made.* The reasonableness of regulations is a question of law for the courts.' "

The court continued to quote from the same textual authority to the effect that the right to attend public schools is conditioned on compliance by pupils with established reasonable rules, regulations and requirements of the school authorities, breaches of which may be punished by suspension or expulsion *and that the school authorities have the right to define the offenses for which the punishment of exclusions may be imposed, to determine whether the offense has been committed and that such discretion vested in school authorities is very broad.*

Quoting further with approval in the same opinion from the Supreme Court of Illinois the court in speaking of the discretionary power of a school board on a high school level said: " * * * its acts will not be interfered with nor set aside by the courts, unless there is a clear abuse of the power and discretion conferred. Acting reasonably within the powers conferred, it is the province of the board of education to determine what things are detrimental to the successful management, good order, and discipline of the schools and the rules required to produce these conditions."

In the publicized case a few years ago when women sought a writ of mandamus to compel the board of directors of Texas A & M College to matriculate them as students[3] the Waco Court of Civil Appeals held the legislature had entrusted to the Board the government of the college, with power to make such by-laws, rules and regulations as it may deem necessary and proper for the governing of the college and that it was discretionary with the Board as to whether they accepted women as students. The court then said, " * * * this discretionary power cannot be changed by judicial decree * * *."

Donna Independent School Dist. v. First State Bank, Tex.Civ.App., 227 S.W. 974 involved the selection by the Board of

Trustees of a depository for school district funds. The San Antonio Court of Civil Appeals held trustees with discretionary powers will not be interfered with in the exercise of their discretionary powers *unless there is a flagrant abuse of such powers.*

Since institutions at the high school level also owe their existence to legislative enactments, we feel legally established rules concerning the discretionary power of those school authorities add some weight to the question under discussion.

In Splawn v. Woodard, Tex.Civ.App., 287 S.W. 677, where reservations at a dormitory was the basis of contention the Austin Court of Civil Appeals held that the discretion of the Board of Regents " * * * is not a subject of court control, *except, perhaps, in case of palpable abuse* * * *."

Relator apparently recognizes the rules of law heretofore announced, since his contention is bottomed upon the assertion that the West Texas State University authorities were unreasonable, arbitrary and capricious in the indefinite suspension. We must, therefore, look to the rules promulgated and the conduct with respect thereto.

The men's dormitory contract, which was executed by relator, in part is as follows:

"2. Each man is held accountable for dormitory regulations and general university regulations as published in the university catalog.

"3. *Each man is accountable as an adult citizen who respects the laws of the community, state and nation both on and off the campus.*

" * * *

"b. Intoxicants of any kind are totally unacceptable. Any student caught possessing or drinking intoxicants (including beer) is subject to suspension.

3. Heaton v. Bristol, Tex.Civ.App., 317 S.W.2d 86 (writ ref.) cert. den. 359 U.S. 230, 79 S.Ct. 802, 3 L.Ed.2d 765, reh. den. 359 U.S. 999, 79 S.Ct. 1123, 3 L.Ed.2d 987.

"*   *   *

"Parking Areas: Campus parking areas are a necessary part of the dormitory and considered so by the university.

"*   *   *

"I understand that the violation of the above regulations makes me subject to suspension from the university."

The traffic and parking regulations of the school provide, inter alia, that:

"A. *Every person operating a motor vehicle on the West Texas State University campus is held responsible for obeying all* university rules and regulations, *city and state laws regulating traffic* and parking on campus.

"B. The registrant of the vehicle is held responsible for the safe operation and proper parking of his vehicle, regardless of who may be the driver or operator.

"C. The legal speed limit on campus:
      Super 48          30 MPH
      *Other Streets      20 MPH*
      Parking Lots      10 MPH"

Misccellaneous requirements provide:

"Student Conduct. *University men and women are expected to conform to high standards of adult behavior, both on and off the campus. Students are accepted in the University only as responsible law-abiding adults, and are subject to suspension from the University for any violation of the law or for irresponsible, immature behavior, either on or off the campus.*"

The Catalog for West Texas State University provides on Page 34 that:

"Student Conduct. *University men and women are expected to conform to high standards of adult behavior, both on and off the campus.* Students re-

siding in residence halls are expected to comply to the letter and to the spirit of the regulations of residence halls. Deviation from such standards may result in suspension from the University."

Aldridge's lack of conformity to *high standards of adult behavior* first came to the attention of the school authorities by his conduct observed by a university security officer and Liquor Control Board officer at 1:00 o'clock a. m., January 8, 1964. At that time he was apprehended while in the process of getting out of an automobile on the parking lot of one of the dormitories, along with two other students who were minors. He admitted he had been drinking and there was found in the car a pint bottle partially filled with bourbon whiskey, a bottle of beer and two 4/5 pints of Bacardi Rum. He denied they were his, but he was the only adult of the three who could have legally purchased the alcoholic beverages. He was given disciplinary punishment but allowed to select from several choices of punishment. He chose to perform fifteen hours of assigned manual labor duties in the security office.

Six days later having, by admission, consumed three beers[4] during the afternoon he was observed speeding in his roommate's 1966 GTO[5] on 26th Street in a 20 mph zone on the campus near the cafeteria during the supper hour when students were crossing the street from their dormitories to go for their evening meals. He admitted the speedometer showed close to 60 mph and that the car was "fishtailing." Dr. Carruth testified he admitted to a speed of 65 mph to him. One witness who observed the incident testified at one time it appeared he was angling toward two parked cars and that he came very close to them. This witness, Jerry McManemy, also testified there were a good many students in the area at the time. That night he and his roommate went to the home of Chief Se-

---

4. The record does not show the size of the containers from which they were consumed.

5. A GTO appears to be a racing type sports model car with twin four-barrel carburetors capable of great speed.

curity Officer Hudson and the roommate, Mike Nance, tried to prevail on the officer to let him take the blame for the speeding incident because Aldridge was under disciplinary action at the time for the incident at 1:00 o'clock a. m., January 8. Officer Hudson testified Aldridge was under the influence of intoxicants to a degree at the time he was in his home approximately one hour and a half after the speeding incident.

For the offense just related Aldridge was advised on January 24, 1966, by Dr. Carruth that he was placed on probation with the conditions that he was not to have his car on the campus and was not to drive his car or any other car on the campus or in the City of Canyon during the period of probation, thus receiving a second opportunity to conform to the rules of the institution.

On the very next night he was identified as the driver of a speeding automobile by a campus security officer and later that evening apprehended by a City of Canyon patrolman for driving at an excessive speed in his own car in the City of Canyon. On February 3 he was brought before the disciplinary committee heretofore named and given an opportunity to state his case. After he had done so and Dr. Carruth had presented the facts concerning the record, those two retired from the room. The committee then in closed session discussed the case and voted unanimously for indefinite suspension.

As part of his contention that the authorities acted unreasonable, arbitrary and capricious relator's chief complaint appears to concern the scope of the restriction placed upon his use of automobiles and the time at which his probationary period started, yet in his own sworn pleadings he alleged in effect that he was advised by Dr. Carruth he was restricted from operating his automobile on the campus, or on the

streets of Canyon or the highways of Randall County.

As to whether the probation was in effect on January 25, the record shows Aldridge was living in the dormitory on the campus, even though the school was in the process of registering students for a new semester that had not yet begun. He had knowledge that he was on probation when he was apprehended on the night of January 25, as evidenced by the fact that he told the police officer " * * * I wasn't supposed to be driving a car or anything and asked him if he would not report me to the school officials * * *" He also admitted to driving his car " * * * in front of the gymnasium and through the main drag * * *" in Canyon, so it appears clear to us that he was consciously violating a condition of his probation.

■ Under the authorities heretofore cited and those of courts of last resort from other jurisdictions [6] of like import announcing the broad discretion vested in school officials concerning the operation of public schools, we hold the officials did not act unreasonable, arbitrary and capricious, but to the contrary showed considerable restraint in dealing with this student who was obviously unmindful of the rules of the university seeking to give him an education and prepare him for useful citizenship.

■ Though the trial court in the process of announcing its judgment was very critical of the rules of West Texas State University we find no difficulty in understanding the meaning of a requirement that students' conduct should conform to *high standards of adult behavior* both on and off the campus. We do not question the fact that some other adults might have done the very acts and flaunted the very probationary conditions the record shows Aldridge was guilty of, but we do say that

6. Wood v. Simpson, 146 Md. 547, 126 A. 882, 39 A.L.R. 1016; Pugsley v. Sellmeyer, 158 Ark. 247, 250 S.W. 538, 30 A.L.R. 1212; State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822, Tennessee Supreme Court.

they did not conform to high standards of adult behavior.

Additionally, there is no escaping the fact that the speeding incident which resulted in placing Aldridge on probation was a violation of the dormitory contract holding each man accountable as an adult citizen who respects the laws of the community and state; a violation of the traffic regulations of the school; and a violation of "Miscellaneous Requirements" under General Regulations in the Catalog, providing: "Students are accepted in the University only as responsible law-abiding adults, and are subject to suspension from the University for any violation of the law or for immature behavior either on or off the campus."

It is difficult to imagine a period in the life of our nation when the courts need to give greater support to public school authorities concerning their discretion in dealing with students than now, so long as such discretion is not exercised in an unreasonable, arbitrary and capricious manner. We do not believe such adjectives applied to the manner in which the officers of West Texas State University exercised their discretion in the instant case. We agree with the Supreme Court of Tennessee in State ex rel. Sherman v. Hyman, supra, to the effect that a fair hearing before school officials does not contemplate a trial as in a chancery court or court of law. The student should be given every fair opportunity of showing his innocence, which Aldridge had. When they have done this and the disciplinary committee has reached a conclusion, they have done all the law requires them to do.

Though Aldridge had already been placed on probation, violated it and been suspended, the trial court through its questions propounded to the school authorities apparently sought to have them accept him again on still another probationary status. When they refused, " * * * considering all the circumstances that have occurred," he issued the harsh remedy of mandamus against them.

While the law is settled that mandamus may issue to compel the exercise of discretion where there has been a refusal to act at all, it will not issue for the purpose of directing the exercise of discretion in a certain manner.[7] Mandamus is primarily a means of compelling the performance of purely ministerial duties.[8] The officers of the respondent school in the exercise of discipline of students clearly had discretionary authority as distinguished from only ministerial duties.

It must be kept in mind here that the conduct of Aldridge that prompted the probation was highly excessive speed in a low speed zone, in a strategic area after he had been drinking alcoholic beverages, which could very well have resulted in the death of one or more persons. Though he testified he drank only three beers during the afternoon before the speeding incident it is significant that an hour and a half later he was still under the influence of alcohol to some degree when he went to the home of the security officer. His actual suspension was for a violation of the condition of the probation assessed for the serious offense just described.

From all the authorities cited and the facts of the case, we hold the officers of West Texas State University, in the exercise of the discretion vested in them, had the authority to invoke the indefinite suspension and that the trial court exceeded its authority in issuing the writ of mandamus.

Accordingly, the judgment of the trial court is reversed and rendered.

---

7. Morton's Estate v. Chapman, 124 Tex. 42, 75 S.W.2d 876; Industrial Accident Board v. Glenn, 144 Tex. 378, 190 S.W. 2d 805; McDowell v. Hightower, 111 Tex. 585, 242 S.W. 753.

8. Denison v. Sheppard, 122 Tex. 445, 60 S.W.2d 1031; United Production Corporation v. Hughes, 137 Tex. 21, 152 S.W.2d 327.