# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00131-CV

---

**Appellants, University of Texas at Austin President Jay Hartzell; University of Texas at Austin Registrar Mark Simpson; University of Texas Dean of Students Soncia Reagins-Lilly; University of Texas Regents Kevin Paul Eltife, R. Steven Hicks, Christina Melton Crain, Jodie Lee Jiles, David J. Beck, Kelcy L. Warren, Janiece M. Longoria, Nolan Perez, and James Conrad Weaver, in their official capacities // Cross-Appellant, S.O.**

**v.**

**Appellee, S.O. // Cross-Appellees, University of Texas at Austin President Jay Hartzell; University of Texas at Austin Registrar Mark Simpson; University of Texas Dean of Students Soncia Reagins-Lilly; University of Texas Regents Kevin Paul Eltife, R. Steven Hicks, Christina Melton Crain, Jodie Lee Jiles, David J. Beck, Kelcy L. Warren, Janiece M. Longoria, Nolan Perez, and James Conrad Weaver, in their official capacities**

---

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-000517, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## CONCURRING AND DISSENTING OPINION

I respectfully dissent because I would hold that the University of Texas System Board of Regents (the Board) has the authority to revoke a former student's degree for academic dishonesty so long as, as relevant here, it affords due process under the United States Constitution and due course of law under the Texas Constitution. I would thus sustain the University officials' second issue.

I would also sustain their first issue because S.O.'s claims that the University officials may not revoke her degree are unripe, and she lacks standing to bring them, because her degree has not been revoked. I respectfully dissent for this further reason.

I concur in the majority opinion's disposition of S.O.'s second cross-issue holding that the trial court lacked jurisdiction to grant her requested Declarations IV and V. However, because of my conclusions on the University officials' two issues, my analysis of S.O.'s first cross-issue would be postured differently from the majority opinion's. Thus, as to her first cross-issue, I concur only in the portion of the Court's judgment disposing of that issue.

## I. UNIVERSITY AUTHORITY

In their second issue, the University officials contend that the trial court "erred in denying [their] Second Plea to the Jurisdiction because . . . the University of Texas at Austin has the power to revoke a degree conferred." The trial court ruled that the University officials lack either express or implied authority to revoke S.O.'s degree, so any attempt by them to revoke her degree would be *ultra vires*. The University officials argue that revoking a degree for academic dishonesty is necessary to protect the University of Texas at Austin (UT): "awarding . . . a degree on a student who has not earned it hurts the reputation of the school in the broader academic and scientific community, thereby impairing its ability to attract qualified students." They also argued that revoking a degree for academic dishonesty protects the welfare of current students, the value of former students' degrees, and UT's academic integrity.

The majority agreed with the trial court, and I respectfully dissent from the majority opinion's holding on this issue for two interrelated reasons: the majority opinion interprets the relevant statutory language too narrowly, and it mistakenly views universities as mere state agencies for all purposes. They are instead something unique in our law.

2

*A.*

*1.*

The statutory language specific to UT and relevant here is from Education Code section 65.31(a) and (c). It provides that the Board "is authorized and directed to govern, operate, support, and maintain each of the component institutions" of the system and "has authority to promulgate and enforce such other rules and regulations for the operation, control, and management of . . . the component institutions . . . as the board may deem either necessary or desirable." Tex. Educ. Code § 65.31(a), (c). Texas courts have interpreted this very language, with implications for this suit.

The Supreme Court of Texas has located extraordinarily broad academic authority in this statute's predecessor, which authorized the Board to "make and enact all such by-laws, rules, and regulations necessary for the successful management of" UT. *See Foley v. Benedict*, 55 S.W.2d 805, 806, 808 (Tex. [Comm'n Op.] 1932) (orig. proceeding) (citing Act effective May 4, 1895, 24th Leg., R.S., ch. 111, § 1, sec. 8, 1895 Tex. Gen. Laws 169, 169, *repealed and recodified in Education Code by* Act of May 22, 1971, 62nd Leg., R.S., ch. 1024, §§ 1, 37, sec. 65.31, 1971 Tex. Gen. Laws 3072, 3145, 3360 (current version at Tex. Educ. Code § 65.31)); *id.* at 810 (Supreme Court adopted *Foley* opinion). As explained in *Foley*, under the statutory authorization to make rules to run UT, the Board enacted rules for expelling medical students who fell short of certain academic criteria. *See id.* at 806. An expelled medical student sought a writ of mandamus directing UT officials to reinstate him. *Id.* The Court located the Board's academic authority to expel in a statute that nowhere refers to any such authority:

> The Legislature of this state not having provided who shall be admitted to the University, and having delegated *the power to make rules and regulations necessary to the government of the University*, to the board of regents, they are

3

invested with the power of determining what classes of persons shall be admitted[1] to the University, provided that the rules and regulations in that regard must be reasonable and not arbitrary. The authorities sustain certain general rules with regard to the government of institutions supported and maintained by the state. . . . The courts will not interfere with the exercise of discretion by school directors in matters confided by law to their judgment, unless there is a clear abuse of the discretion, or a violation of law.

*Id.* at 808 (emphasis added; internal citation and quotation omitted). Because the authority to expel was implied by the statutory authorization to make rules to run UT, the Court denied mandamus. *Id.* at 810.

A decision from our sister court of appeals interpreted Section 65.31 just as broadly. In *Eiland v. Wolf*, another medical student sued for reinstatement, this time to the University of Texas Medical Branch at Galveston (UTMB), and the First Court of Appeals rendered judgment against him. 764 S.W.2d 827, 828–29, 834, 836, 839 (Tex. App.—Houston [1st Dist.] 1989, writ denied). The court of appeals noted that the Board's statutory authority to prescribe degree programs permitted it to create an academic catalog and that its statutory authority "to promulgate university rules and regulations" allowed the catalog to stipulate when students could be academically expelled, though the statute says not a word about expulsion. *See id.* at 837 (citing Tex. Educ. Code § 65.31). The court in *Eiland* also cautioned judges to "accord great deference" to academic decisions lest they unwisely "further enlarge the judicial presence in the academic community." *Id.* (citing and quoting *Board of Curators v. Horowitz*, 435 U.S. 78, 90 (1978)); *see also University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 931

---

[1] Note that the Court mentioned *admissions* authority as within the authority to make rules to run UT while the Court was locating the *expulsion* power. This reasoning undermines the majority opinion's view that the authority to *award* degrees cannot include the authority to *revoke* them for academic dishonesty.

4

(Tex. 1995) ("Judicial interposition in the disciplinary decisions of state supported schools raises problems requiring care and restraint." (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))).

*Foley* and *Eiland* demonstrate that Section 65.31 empowers the Board to do more than the majority opinion recognizes.

*2.*

The breadth of university boards' authority to make rules to run their universities is not confined to the University of Texas System, which is evident from two cases. The First Court of Appeals located similarly broad authority in the University of Houston (UH) system's statutory authorization that "[t]he governance, control, jurisdiction, organization, and management of the University of Houston System is hereby vested in the" UH board. Tex. Educ. Code § 111.20(c), *cited in Alcorn v. Vaksman*, 877 S.W.2d 390, 403 n.5 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (en banc) ("The dismissal of students at the University of Houston is within the appellants' scope of authority. Tex. Educ. Code Ann. § 111.20(c)."). Whether to expel a graduate student under this general statutory authorization, in good faith and while respecting due process, was an "academic decision": "'[W]hen courts review the substance of academic decisions . . . they should show great respect for the teacher's professional judgment.' This sound rule is based on the belief that university administrators, not judges, should make academic decisions needed to run a university." *Alcorn*, 877 S.W.2d at 397 (internal citation omitted) (quoting *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir. 1987)); *see also Mahavongsanan v. Hall*, 529 F.2d 448, 449–50 (5th Cir. 1976) ("[W]e know of no case which holds that colleges and universities are subject to the supervision or review of the courts in the uniform application of their academic standards.").

According to the Seventh Court of Appeals, a statutory authorization to make rules to run a university authorized a student's expulsion for drinking; speeding; and, after being prohibited from bringing his car back to campus, doing just that. *See Cornette v. Aldridge*, 408 S.W.2d 935, 937, 940–42 (Tex. App.—Amarillo 1966, no writ) (per curiam). The court reversed a writ of mandamus in the student's favor because of statutory language authorizing then-West Texas State University's board to make rules to run the university: "[T]he legislature has vested in the Board of Regents of the subject institution broad and general power and authority to control and manage the school and establish such rules and regulations as shall be deemed necessary for the efficient administration of the institution." *Id.* at 937. The court even relied on *Foley*'s analysis of "the same textual authority to the effect that" university boards may condition students' attendance on "reasonable rules, regulations and requirements." *Id.* at 938–39 (quoting and applying *Foley*).

In sum, Section 65.31(a) and (c) authorize the Board to do more than the majority opinion recognizes. This was recognized as early as 1932, in *Foley*, and continues today for UT and for other state universities with similar statutory authorizations. Just as the Supreme Court and sister courts of appeals have located university boards' academic authority to expel a student in the statutory authorizations to make rules to run a university, I would locate in that broad authority the Board's authority to revoke a degree for academic dishonesty.[2]

---

[2] It is no distinction to say that *Foley*, *Eiland*, *Alcorn*, and *Cornette* cannot speak to degree revocation because a degree involves a property interest while dismissal from pre-degree participation in an academic program does not. Whether a plaintiff is asserting a property interest is part of a due-process analysis. *See, e.g.*, *Board of Curators v. Horowitz*, 435 U.S. 78, 82 (1978); *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). I do believe that due process restricts the authority to revoke a degree for academic dishonesty. *Cf. Heaton v. Bristol*, 317 S.W.2d 86, 93, 96–98, 101 (Tex. App.—Waco 1958, writ ref'd) (reversing injunction and rendering judgment against women seeking admission to then-Agricultural &

*3.*

The expulsion cases expose one of the weaknesses in the majority opinion's approach. Its view of university authority as limited virtually only to express statutory language would prevent UT from expelling anyone. Nothing in UT's authorizing statutes authorizes expulsion. *See* Tex. Educ. Code §§ 65.01–.461, 67.01–.71. So too with UTMB. *See id.* §§ 74.001–.008. UT's and UTMB's authorizing statutes refer only to admitting students, including medical students like those in *Foley* and *Eiland*. *See id.* §§ 65.31(c), 65.41, 74.202; *see also id.* § 51.352(d)(4) (admissions authority for all state university boards). The majority opinion's approach therefore would have required opposite conclusions from those reached in *Foley* and *Eiland*—both of which involved Section 65.31's language—rejecting any authority to expel because the statute did not expressly mention expulsion. *Cf. ante* at 12–13 (rejecting Board's authority to *revoke* degrees for academic dishonesty because Board expressly may only *award* degrees); *but see Splawn v. Woodard*, 287 S.W. 677, 681–82 (Tex. App.—Austin 1926, no writ) (considering it "clear" that "full discretionary powers over the buildings" at UT had been vested in UT's board by legislative grants of authority merely to "spend[] the income from

---

Mechanical College of Texas because College's board enjoyed statutory authorization to "govern[] the College, with power to make such by-laws, rules and regulations for the governing of the College as it may deem necessary and proper for that purpose," but recognizing that state or federal constitutions may override board's statutory authority).

Further, S.O. argues that UT can never afford anyone due process in proceedings held within the university. *Than* rebuts that argument because, there, although the university had violated a medical student's due-process rights when it expelled him, the Court required the remanded due-process-compliant hearing to take place within the school, rather than in the courts, thus recognizing universities' capacity to afford due process in their hearings. *See Than*, 901 S.W.2d at 934; *see also Merrow v. Goldberg*, 672 F. Supp. 766, 773 (D. Vt. 1987) ("As for the composition of the [credit-revocation] tribunal, '[a] graduate or professional school is, after all the best judge of its students' academic performance and their ability to master the required curriculum.'" (quoting *Horowitz*, 435 U.S. at 85–86 n.2)).

7

the permanent fund for 'permanent improvements to be erected on the campus of [UT]'" and to "mak[e] contracts with 'architects, planmakers, landscapers, or draftsmen,' . . . concerning 'all contracts for the construction or erection of such permanent improvements'"). The majority opinion is thus out of step with the Supreme Court's and sister courts of appeals' longtime treatment of Section 65.31 and similar university statutes.

*4.*

The Section 65.31 authority to make rules to run UT is bound up in a body of law in Texas and elsewhere discussing what "academic decisions" a university is empowered to make. *See, e.g.*, *Cieboter v. O'Connell*, 236 So.2d 470, 471–73 (Fla. Dist. Ct. App. 1st Dist. 1970) (denying mandamus sought by graduate student against University of Florida president because president and faculty were within their academic authority, "free[] from interference from other noneducational tribunals," to require graduate student to receive personal counseling for unspecified "misconduct" before considering student's dissertation (citing *Connelly v. University of Vt. & State Agric. Coll.*, 244 F. Supp. 156, 160 (D. Vt. 1965))).

The University officials argue that revoking a degree for academic dishonesty is just such an academic decision. They say that it implicates the Board's other statutory authorities to "enhance the public image of each institution under its governance," *see* Tex. Educ. Code § 51.352(a)(2), or to "strive for intellectual excellence," *see id.* § 51.354(6). They liken S.O.'s marshaling of scientific data in her dissertation to the public presentation of scientific data in *Pugel v. Board of Trustees of the University of Illinois*, which warranted academic sanction by a university:

8

A scientific presentation is connected directly with the University's mission of intellectual enrichment and research. Moreover, the public presentation of false data by a graduate-level student affiliated with the University has significant ramifications on the discipline and rigor of the University's intellectual enterprise and, as a result, on the University's reputation in the broader academic and scientific community.

378 F.3d 659, 668 (7th Cir. 2004). They cite another court's statements that "plagiarizing a doctoral thesis is . . . significant" and "risks impugning a university's integrity," *Jaber v. Wayne State University Board of Governors*, 487 F. App'x 995, 997 (6th Cir. 2012), and that "[a]warding degrees . . . to students who have not earned them[] will decrease the value of degrees in general" because "it will hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money," *United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997). And they argue that inspecting the scientific work for which a degree was granted "is an academic matter that should be resolved in the university setting."

In each instance—making rules to run UT, under Section 65.31; enhancing a university's public image, under Section 51.352(a)(2); and striving for intellectual excellence, under Section 51.354(6)—the statutory authorization does not limit the Board's discretion. When a state actor is authorized to perform certain acts without restriction on how the actor may perform them, the actor generally has unbounded discretion to perform the acts. *See Hall v. McRaven*, 508 S.W.3d 232, 241–43 (Tex. 2017). In *Hall*, the Supreme Court of Texas considered a Board grant of authority to the UT system's chancellor. The grant rested on the Board's "expansive authority," conferred by statute, "to 'govern, operate, support, and maintain' the System." *Id.* at 235 (characterizing and quoting Tex. Educ. Code § 65.31(a)). Under that statutory authority, plus those for providing policy direction to UT and setting admissions

9

standards, the Board authorized the chancellor to "determine whether a Regent may review information that is protected by [the Family Educational Rights and Privacy Act (FERPA)]." *Id.* at 242. That authorization was "unrestricted" regarding how the chancellor could make the FERPA determination: "[h]is discretion in making that determination is otherwise unconstrained." *Id.*; *see also id.* at 239 ("An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority."). The authorization required the chancellor to interpret federal privacy law. Because it did not restrict how he could do so—such as by restricting him from applying federal privacy law erroneously—the chancellor's "discretion to interpret collateral federal privacy law [was] 'absolute.'" *Id.* at 243.

Here, the University officials' argue that the Board's authorities (1) to make rules to run UT, (2) enhance the university's public image, and (3) strive for intellectual excellence must be viewed with *Hall*'s instructions about officials' discretion in mind. The University officials argue that revoking a degree for academic dishonesty serves each of these three authorities. Because the Board enjoys unrestricted discretion to exercise them, the *Hall*-compliant view is that the Board may revoke a degree for academic dishonesty to exercise these authorities. *See* 508 S.W.3d at 241–43; *see also Goodreau v. Rector & Visitors of Univ. of Va.*, 116 F. Supp. 2d 694, 703 (W.D. Va. 2000) (applying Virginia law) ("Because degree revocation is reasonably necessary to effectuate the Board's power to confer degrees and to regulate student discipline, that power must be implied, giving the Board the authority to revoke a degree for good cause and after due process."). The judiciary should resist interfering with this academic decision, *see Alcorn*, 877 S.W.2d at 397 ("[U]niversity administrators, not judges, should make academic decisions needed to run a university." (quoting *Clements*, 835 F.2d

10

at 1005)); *Eiland*, 764 S.W.2d at 833 ("[A]cademic evaluations of a student are not readily adapted to judicial and administrative review." (citing *Horowitz*, 435 U.S. at 90)); *see also Mahavongsanan*, 529 F.2d at 450 (stating that universities must enjoy "wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements" (citing *Militana v. University of Miami*, 236 So.2d 162, 164 (Fla. Dist. Ct. App. 3d Dist. 1970) (per curiam))), until some constitutional or statutory limit thwarts it. There are no such limits in Education Code sections 51.352(a)(2), 51.354(6), or 65.31(a) or (c). Viewing those statutes through *Hall*'s prism, and with the guidance afforded by *Alcorn* and *Eiland* and the "academic decisions" body of law, I conclude that the Board enjoys the statutory authority to revoke a degree for academic dishonesty.

### B.

Specific statutes aside, the majority opinion assumes that state universities are mere state agencies for all purposes. They are not. *See, e.g.*, Tex. Gov't Code § 2001.003(7)(E) (no "institution of higher education" is a "state agency" under the Texas Administrative Procedure Act). They are unique entities with corresponding authorities inherent in their status as a university.

Even S.O. argues that UT is no mere state agency. She tells us that "UT is Not a Statutorily Defined 'State Agency,'" arguing that the Texas Administrative Procedure Act does not treat universities like it treats state agencies. The same topic arose before the trial court:

> The Court: Isn't there a . . . case that provides that [the court] can't grant attorney fees against . . . a state agency on a declaratory judgment claim?

11

> [S.O.'s counsel]: Um, they are not a state agency, though, under the APA so . . . I'm not familiar with the case you're referring to, Your Honor. I can look into that further if you want."

Longstanding Texas law shows that a university enjoys authorities inherent in its status as a university, for three reasons.

*1.*

First and most notably, this Court has recognized universities' inherent authorities. In *Morris v. Nowotny*, a former student sued UT for barring him from readmission to the university and from the campus. 323 S.W.2d 301, 302, 304–05, 308 (Tex. App.—Austin 1959, writ ref'd n.r.e.). This Court examined whether UT could bar the student's readmission, including from the campus premises, and located UT's relevant authority either by implication from the UT statute's "management and government of the University" or in the university's inherent authority:

> The government of the University of Texas is vested in a Board of Regents with authority to "enact such by-laws, rules and regulations as may be necessary for the successful management and government of the University." We are not advised as to the nature of rules and regulations, if any, adopted under the authority of these statutes but without such knowledge it is our opinion that the above statutes imply the power and if they do not so imply then that the power is inherent in University officials to maintain proper order and decorum on the premises of the University and to exclude therefrom those who are detrimental to its well-being.

*Id.* (internal citation omitted) (quoting predecessor statute to Tex. Educ. Code § 65.31); *see also Esteban v. Central Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969) ("We . . . hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may

12

expect that its students adhere to generally accepted standards of conduct; that, as to these, flexibility and elbow room are to be preferred over specificity; that procedural due process must be afforded . . . ; and that the courts should interfere only where there is a clear case of constitutional infringement."); *Waliga v. Board of Trs. of Kent State Univ.*, 488 N.E.2d 850, 852–53 (Ohio 1986) (reviewing university's "inherent" authority to revoke degrees and noting that courts refuse to interfere with "fundamental university functions").

*2.*

Next, Texas law has recognized inherent university authority in private universities, which, unlike state universities, do not exist or enjoy authority because of statutes. For example, the Second Court of Appeals affirmed a take-nothing summary judgment rendered against a Texas Christian University (TCU) student who sued TCU officials for negligence for alleged abuse and mistreatment at the nursing school. *Guinn v. Texas Christian Univ.*, 818 S.W.2d 930, 931 (Tex. App.—Fort Worth 1991, writ denied). The court concluded that the student had alleged no "recognized cause of action *against an educational institution*." *Id.* at 933–34 (emphasis added). It reached this conclusion by recognizing in TCU the familiar "academic decision" authorities that state universities enjoy. The court declined "to intrude into a university's educational process, and to meddle in its student evaluation procedures and decision-making" because courts "should show great respect for a faculty's professional judgment" in what "is genuinely an academic decision" and refuse to "override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* (citing *Horowitz,*

13

435 U.S. at 92). The court then cited *Eiland* as an example of a court following the "mandate" to defer to universities' academic decisions. *Id.* at 933–34.

What other source for TCU's authorities could there be? Not statutes. Not incorporation documents—we don't let corporations harm individuals simply because of their corporate status. As for contract, although private universities' relationships with their students ordinarily arise in contract, *see, e.g.*, *Eiland*, 764 S.W.2d at 838 ("[T]he relationship between a private school and its student has by definition primarily a contractual basis."), nothing in *Guinn* sets forth the terms of TCU's contract with the student or applies any such terms. Instead, the court's by-now-familiar invocation of "academic decision" authorities, including citing *Horowitz* and *Eiland*, signals that it is something inherent in private and public universities alike—and not their kaleidoscope of course catalogs—that authorized TCU's acts. It was its status as a university. *Guinn*, 818 S.W.2d at 932–34; *see also Mahavongsanan*, 529 F.2d at 450 (applying private-university precedent, *Militana*, 236 So.2d at 164, to uphold public university's "wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements").

*3.*

The Legislature adheres to the inherent-authority view of universities. *See, e.g.*, Tex. Educ. Code § 51.352(a) ("It is the policy of this state that the governing boards of institutions of higher education . . . shall exercise the traditional and time-honored role for such boards as their role has evolved in the United States and shall constitute the keystone of the governance structure."). The majority opinion's contrary view, limiting what Texas state

14

universities may do to the bare nouns and verbs in their authorizing statutes, will have significant harmful ripple effects on the Legislature's structuring of the state's public universities.

For example, all agree that UT may grant degrees, but we might differ on why. The majority opinion apparently would locate that authority only in the words of Section 65.31(b), which authorizes the Board to award all "degrees as are customarily offered in outstanding American universities." We know this because of the reasoning by which the opinion rejects the University officials' revocation argument from the same statute. *Cf. ante* at 12–13. That is, while the University officials say that revoking a degree for academic dishonesty is necessary to accomplish the award of degrees, the majority opinion rejects this argument by saying that the grant of authority to award degrees is not "*defeated* absent an attendant authority to revoke the degree at a later date." *Ante* at 12–13. If the specific nouns and verbs are not in the statute, the majority opinion holds, then the university apparently cannot do it, unless its absence would defeat an express authorization.

What of other universities' authority to grant degrees? A university's express authorizations are not "defeated" if the university cannot grant degrees, for Texas state universities may offer non-degree-granting academic programs. *See, e.g.*, Tex. Educ. Code §§ 51.338(a), 51.340(a), 65.31(f), 130.0034(b), 135.52(c). Under the majority opinion's view then, a Texas state university may grant degrees only if a statute expressly allows it to.

These state universities enjoy no express statutory authorization to grant degrees:

- Texas A&M University, *see id.* §§ 85.01–.71, 86.01–.82;

- Midwestern State University, *see id.* §§ 103.01–.11;

- Texas Southern University, *see id.* §§ 106.01–.55; and

15

- Texas Tech University, *see id.* §§ 109.001–.170.[3]

The degrees of hundreds of thousands of Aggies, Mustangs, Tigers, and Red Raiders are in danger because the majority opinion views university authority as limited virtually to express statutory language alone.

We must assume that the Legislature does not create absurdities. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008) (prohibiting statutory interpretations that "lead[] to absurd results"); *Texans Uniting for Reform & Freedom v. Saenz*, 319 S.W.3d 914, 923 (Tex. App.—Austin 2010, pet. denied) (same). When it gave some universities an express statutory authority to grant degrees but did not give Texas A&M, Midwestern State, Texas Southern, and Texas Tech the same express authority, did it intend that those universities may not grant degrees? No. Those universities inherently may grant degrees.

Universities also inherently may revoke degrees for academic dishonesty. Inherent authority—not states' differing statutory-interpretation schemes—is the import of the precedents stemming from the Supreme Court of Ohio's *Waliga*. The court in *Waliga* provided two justifications, both of which apply to UT, for universities' "self-evident . . . inherent authority to revoke an improperly awarded degree." 488 N.E.2d at 852. First was a justification about "undermin[ing] public confidence in the integrity of degrees, call[ing] academic standards into question, and harm[ing] those who rely on the certification which the degree represents" because the degree is a university's ongoing representation to the world. *Id.* Second, English universities, precursors to America's, have enjoyed inherent power to revoke degrees since at least 1723. *Id.* (citing and quoting *R v. University of Cambridge* (1723) 8 Mod. Rep. (Select

---

[3] Compare to Angelo State University, part of the same university system, which does enjoy an express statutory authorization to grant degrees. Tex. Educ. Code §§ 109A.001–.002.

16

Cases) 148 (K.B.)). "The English common law provides precedential rules of decision in Ohio and other states." *Id.* Texas is one of them. *See* Tex. Civ. Prac. & Rem. Code § 5.001(a); *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647–48 (Tex. 2020).

Courts outside Ohio have relied on *Waliga* to support degree revocation, or credit revocation, under the law of

- Maryland, *see Doe v. Salisbury University*, 107 F. Supp. 3d 481, 492–93 (D. Md. 2015);

- New Mexico, *see Hand v. Matchett*, 957 F.2d 791, 794–95 (10th Cir. 1992);

- North Dakota, *see Brown v. State ex rel. State Board of Higher Education*, 711 N.W.2d 194, 198 (N.D. 2006);

- Tennessee, *see Faulkner v. University of Tennessee*, No. 01-A-01-9405-CH00237, 1994 WL 642765, at *5–6 (Tenn. Ct. App. Nov. 16, 1994);[4]

- Vermont, *see Merrow v. Goldberg*, 672 F. Supp. 766, 771–74 (D. Vt. 1987); and

- Virginia, *see Goodreau*, 116 F. Supp. 2d at 703.

Texas's state universities are no less heirs of England's than our sister states' universities are. This might be why the Supreme Court in *Foley* and the Seventh Court in *Cornette* surveyed other jurisdictions' decisions, just like the University officials ask us to do here. *See Foley*, 55 S.W.2d at 809–10; *Cornette*, 408 S.W.2d at 941 & n.6. When our Legislature creates a university, it creates an entity that inherently may grant degrees and revoke them for academic dishonesty.

---

[4] Tennessee, unlike Texas, appears to subject its universities to its state administrative-procedure act. *Compare Faulkner v. University of Tenn.*, No. 01-A-01-9405-CH00237, 1994 WL 642765, at *1 (Tenn. Ct. App. Nov. 16, 1994), *with* Tex. Gov't Code § 2001.003(7)(E).

## II.  JUSTICIABILITY

In their first issue, the University officials contend that the trial court "incorrectly denied [their] Second Plea to the Jurisdiction after this Court correctly held that the issue decided by the trial court is not yet justiciable because revocation has not occurred." Sustaining this issue, they say, should lead this Court to render judgment "that the issue of whether [the University officials] have authority to revoke a degree is not justiciable." The University officials argue that it is not justiciable because (1) it is not ripe, under applicable authorities, and (2) S.O. lacks standing to challenge a degree revocation that has not occurred and might not occur, under other applicable authorities.

To support those arguments, the University officials rely not only on the parties' 2017 appeal, *S.O. v. Fenves*, No. 03-16-00726-CV, 2017 WL 2628072 (Tex. App.—Austin June 15, 2017, no pet.) (mem. op.) [hereinafter "*S.O. 2017*"], but also on other decisions from this Court and from the Supreme Court of Texas. Standing made up no part of this Court's opinion in *S.O. 2017*. *See generally* 2017 WL 2628072.

Yet the majority opinion confines its analysis under the University officials' first issue to *S.O. 2017* and its statements on ripeness alone, declining to address standing. *See ante* at 15–18. *S.O. 2017* and ripeness alone are not the University officials' only justiciability arguments under their first issue. The majority opinion thus declines to analyze fully the University officials' first issue. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."), 47.1 (requiring that opinions "address[] every issue raised and necessary to final disposition of the appeal"); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 152 (Tex. 2012) ("[T]he court must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges when that

18

issue is before the court."); *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex. 2000) ("Because standing and ripeness are components of subject matter jurisdiction, the court of appeals erred in failing to consider [party]'s jurisdictional challenge.").

### A.

As to ripeness, the University officials argue that S.O.'s authority-to-revoke claims are not ripe because "[a] declaration regarding authority to revoke a degree is the precise example of 'uncertain or contingent future events that may not occur as anticipated or may not occur at all,'" quoting *Waco Independent School District*, 22 S.W.3d at 852. They continue their argument by relying on two more decisions from the Supreme Court of Texas:

> Texas courts "do not give advice or decide cases upon speculative, hypothetical or contingent situations." *Camarena v. Texas Employment Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). Because revocation of S.O.'s degree is speculative and contingent on multiple factors, the . . . declaration that State Appellants lack authority to revoke a degree is an improper advisory opinion. *Patterson v. Planned Parenthood of Houston & Se. Texas, Inc.*, 971 S.W.2d 439, 443 (Tex. 1998) ("The courts of this state are not empowered to give advisory opinions.").

I agree with the University officials. In their second plea to the jurisdiction, they confirmed that the outcome of any future academic proceeding against S.O. is simply uncertain. They attached to the plea evidence of notice to S.O. that she might be subject to a proceeding and unspecified "disciplinary sanction[s]" and of the rules that would apply in the proceeding, which allow for several possible sanctions besides revocation, including a "written warning," "withholding of grades [or] official transcript," and others "as deemed appropriate under the circumstances." In response to the plea, S.O. confirmed that there are no disputed facts and that the trial court could rule on justiciability as a matter of law by asking the trial court to read her motion for summary judgment, which disclaimed any fact dispute.

19

It is thus factually undisputed that the University officials might simply impose a lesser sanction or even conclude that she has violated no academic rule at all. *See University of Tex. v. Poindexter*, 306 S.W.3d 798, 806 (Tex. App.—Austin 2009, no pet.) ("If . . . the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts."). Under our Supreme Court's precedents, that makes S.O.'s authority-to-revoke claims unripe: we cannot yet know whether her degree will be revoked. *See Waco Indep. Sch. Dist.*, 22 S.W.3d at 851–53 (holding that constitutional challenge to school district's student-retention policy was unripe because "no student . . . had been retained or given notice of retention under the challenged policy because the [standardized] test results were not yet available. . . . Thus, at the time this suit was filed, the alleged harm to the students caused by retention was still contingent on uncertain future events, *i.e.*, the students' performance on the standardized tests and, if necessary, in WISD's remediation program"); *Patterson*, 971 S.W.2d at 444 (vacating trial court's judgment and dismissing as unripe suit that sought to enjoin State from enforcing state legislative rider that could endanger federal funding because State's enforcement hinged on its plan to enforce rider in way that would comply with federal law, thus preserving federal funding, and Court "simply d[id] not know what the federal government will do if the state carries out its plan"); *Camarena*, 754 S.W.2d at 151 (vacating injunction that prohibited Employment Commission from "denying, prejudicing, or detrimentally affecting" unemployment benefits for farm workers under newly enacted legislation because Commission "had not attempted to deny, prejudice or detrimentally affect the benefits conferred by [the legislation]," making suit unripe because it sought to redress "a hypothetical situation which might or might not arise at a later date"); *see also Texas Educ. Agency v. Academy of Careers & Techs., Inc.*, 499 S.W.3d 130, 136–37 (Tex. App.—Austin

20

2016, no pet.) (holding that suit challenging future taking of property, which allegedly would flow from future revocation of school charter, was unripe because charter had not yet been revoked); *cf. City of El Paso v. Caples Land Co.*, 408 S.W.3d 26, 33 (Tex. App.—El Paso 2013, pet. denied) (holding that building owner's challenge to city's remediation request was ripe because city had "warned [building owner] that noncompliance *would result* in the property's certificate of occupancy being revoked" (emphasis added)).

### *B.*

As for standing, I note first that standing and ripeness are different: "'[r]ipeness, like standing, is a threshold issue that implicates subject matter jurisdiction, and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented.' While standing focuses on the issue of *who* may bring an action, ripeness focuses on *when* that action may be brought." *Waco Indep. Sch. Dist.*, 22 S.W.3d at 851 (quoting *Patterson*, 971 S.W.2d at 442). "[I]f a plaintiff lacks standing to assert one of his claims, the court lacks jurisdiction over that claim and must dismiss it. . . . [T]he court must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges when that issue is before the court." *Heckman*, 369 S.W.3d at 150, 152. "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Id.* at 153 (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

For a plaintiff to have standing to bring a particular claim, the plaintiff must clear three hurdles: (1) the plaintiff must have been personally injured, (2) the alleged injury must be "fairly traceable" to the defendant's conduct, and (3) the alleged injury must be "likely to be

redressed by the requested relief." *Id.* at 155. Under the first hurdle, the injury "must be concrete and particularized, actual or imminent, not hypothetical." *Id.*

S.O. pleaded for eight declarations and other injunctive relief. The trial court awarded her only declaratory relief on only one claim, declaring that the University officials lack express or implied authority to revoke her degree.

The University officials argue that these declarations redress only a speculative injury: the possible revocation of S.O.'s degree, which might not result from any future academic proceeding. The evidence attached to the University officials' plea showed that revoking her degree is not a certainty in the not-yet-conducted proceeding, and her response to the plea disclaimed any fact dispute. Even if a proceeding to consider an academic sanction against S.O. might be imminent, the revocation of her degree is not. I thus conclude that she lacked the required injury to support standing to seek the authority-to-revoke declarations. *See Heckman*, 369 S.W.3d at 160 (holding that plaintiff lacked required injury for standing to bring claim that county and officials deprived him of constitutional right to open courts in criminal prosecution against him because plaintiff "has not alleged that he, personally, was suffering from a deprivation of his right to open-court proceedings at the time he filed suit, or that he faced an imminent deprivation of this right").

## C.

Neither of these conclusions depends on *S.O. 2017*. As to *S.O. 2017*, I agree with the majority opinion's rejection of the University officials' position that *S.O. 2017* affirmatively held that whether the University officials may revoke S.O.'s degree is not justiciable. As *S.O. 2017* recognized, S.O. pleaded two kinds of claims—one about whether the University

22

officials may revoke her degree and another about whether they may hold an academic proceeding against her. *See* 2017 WL 2628072, at \*3 ("[S.O.] alleges that the University does not itself have the authority to divest one of its graduates of a conferred degree through its internal disciplinary proceedings. S.O. complains not simply of the actual revocation of her degree, should that occur, but the fact that the University has put the status of her degree in question and is requiring her to defend it in a proceeding that she alleges the University officials are not authorized to conduct."). *S.O. 2017* addressed only the claims about holding a proceeding; it reserved decision on the authority-to-revoke claims, reaching no holding about them:

> The nature of the controversy, therefore, is whether the University officials' act *of conducting a disciplinary proceeding to consider revoking* S.O.'s degree is *ultra vires*, regardless of its outcome. . . . Once the University officials have conducted the hearing, S.O. may no longer have a claim for prospective relief *to enjoin the hearing*.

*Id.* at \*3–4 (emphases added). The trial court denied relief on all but the authority-to-revoke claims.

I part with the majority opinion because it takes a further step, reading *S.O. 2017* as affirmatively supporting S.O.'s position that her authority-to-revoke claims *are* ripe. The majority opinion says about *S.O. 2017*:

> In sum, this Court reversed and remanded the case to the trial court precisely because the trial court erred when it determined that it did not have subject matter jurisdiction over S.O.'s *ultra vires* claim prior to the time that the University officials actually revoked her degree. Footnote four of the Court's opinion, on which the University officials rely, does not state or imply that S.O.'s *ultra vires* claims are not justiciable until the University has revoked her degree.

23

*Ante* at 18.  The majority opinion then further characterizes its view of *S.O. 2017*'s footnote four and its effect on the University officials' ripeness arguments[5] and then overrules the University officials' first issue without an analysis under the University officials' other cited authorities, including *Waco Independent School District*, *Patterson*, *Camarena*, and *Heckman*.  *See ante* at 18.  This ignores *S.O. 2017*'s express limits.  *S.O. 2017* addressed only "whether the University officials' act of conducting a disciplinary proceeding to consider revoking S.O.'s degree is *ultra vires*, regardless of its outcome."  2017 WL 2628072, at *3.  It made no decision one way or the other about the justiciability of a challenge to the University officials' authority to revoke a degree.  *S.O. 2017*, then, is not enough support on its own for overruling the University officials' first issue.  When analyzing that issue under the Supreme Court of Texas's ripeness and standing

---

[5] I also disagree with the majority opinion's characterization of *S.O. 2017*'s footnote four, even if footnote four does not resolve the University officials' first issue.  *S.O. 2017* distinguished S.O.'s claims about the authority to revoke her degree from her claims about the authority to hold an academic proceeding regardless of revocation: "The nature of the controversy, therefore, is whether the University officials' act of conducting a disciplinary proceeding to consider revoking S.O.'s degree is *ultra vires*, regardless of its outcome." No. 03-16-00726-CV, 2017 WL 2628072, at *3 (Tex. App.—Austin June 15, 2017, no pet.) (mem. op.).  Given this distinction, footnote four is referring to the authority-to-revoke claims' not being ripe and not the hearing claims' ripeness:

> S.O. complains not simply of the actual revocation of her degree, should that occur,[4] but the fact that the University has put the status of her degree in question and is requiring her to defend it in a proceeding that she alleges the University officials are not authorized to conduct.
>
> . . . .
>
> [4] To the extent S.O.'s pleadings complain of or seek a declaration regarding the actual revocation of her degree, an event that has not occurred, that claim is not ripe.

*Id.* at *3 & n.4.

precedents, as I have above, I conclude that S.O.'s authority-to-revoke claims are not yet justiciable. I would sustain the University officials' first issue.

## CONCLUSION

S.O. pleaded several claims for relief, the trial court dismissed all but the authority-to-revoke claims, and S.O. did not cross-appeal the dismissals. On the merits, the trial court was incorrect to conclude that the Board may not revoke a degree for academic dishonesty. Whether implied under the several statutes empowering the Board or inherent in UT's status as a university, the Board has the authority to revoke a degree for academic dishonesty.

On justiciability, because S.O.'s authority-to-revoke claims are not justiciable either because they are unripe or because she lacks standing to bring them, I would reverse the trial court's judgment and render judgment dismissing those claims.

I respectfully concur in part and dissent in part.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Filed: September 4, 2020

25